ROBERT M. LIVINGSTON, M.D., AND METROPOLITAN MEDICAL ASSOCIATES, P.A., APPELLANTS, v. NEW JERSEY STATE BOARD OF MEDICAL EXAMINERS, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 24, 1979—Decided May 21, 1979.

Before Judges Lora, Michels and Larner.

*Ms. Nadine Taub,* Women's Rights Litigation Clinic, argued the cause for appellants (*Messrs. Kleeman* and *Hirsch,* attorneys; *Ms. Taub,* on the brief).

*Ms. Joan D. Gelber,* Deputy Attorney General, argued the cause for respondent (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Mr. Skillman* and *Ms. Gelber* on the brief).

The opinion of the court was delivered by

LORA, P. J. A. D. Robert M. Livingston, a licensed obstetrician-gynecologist, and Metropolitan Medical Associates, Inc., (MMA) an outpatient clinic directed by him and now licensed to perform abortions in this State, challenge the validity of the recently enacted "Termination of Pregnancy Rule," *N. J. A. C.* 13:35–7.2, on procedural and federal constitutional grounds. The rule, which purports to regulate the performance of second trimester abortions, was promulgated by respondent New Jersey State Board of Medical Examiners (Board) after public hearing and independent submission of medical documentation, expert reports and statistics.

The operative terms of the rule[1] may be summarized as

---

[1] The full text of the rule, as published in the *New Jersey Register* on August 10, 1978 (10 N. J. R. 351), reads thus:

13:35–7.2 Termination of pregnancy

(a) The termination of pregnancy is a medical procedure which may be performed only by a physician licensed to practice medicine and surgery in the State of New Jersey.

(b) Beyond the first trimester and within a period of gestation not exceeding 16 menstrual weeks and/or 14 gestational weeks' size as determined by a physician, termination of pregnancy using the dilatation and evacuation procedure shall be performed either in a licensed hospital or a licensed health care facility, and if any other procedure is used the termination of pregnancy shall be performed in a licensed hospital on an inpatient basis.

follows: Beyond the first trimester and "within a period of gestation not exceeding 16 menstrual weeks and/or 14 gestational weeks' size,"[2] an abortion by the "dilatation and evacuation" method may be performed either in a licensed hospital *or* a "licensed health care facility" on an outpatient basis. Abortions to be performed beyond that cut-off date, or by any other medical procedure, must be performed in a hospital on an inpatient basis *only*.

Appellants contend that *N. J. A. C.* 13:35–7.2 is invalid on procedural grounds because it was not "finally adopted" by the Board, and is unconstitutional as an infringement upon a woman's federal constitutional right to seek an elective

---

(c) Termination of pregnancy by any procedure on patients with a gestation exceeding 16 mentsrual weeks and/or 14 gestational weeks' size as determined by a physician, shall be performed only in a licensed hospital on an inpatient basis.

(d) Failure to comply with this rule may subject the physician to suspension or revocation of license to practice medicine and surgery in this State, pursuant to *N. J. S. A.* 45:9–1 et seq., and/or may subject any persons, association, corporation or institution to the sanctions and remedies set forth in *N. J. S. A.* 45:9–22, 45:9–26 and *N. J. S. A.* 45:9–27.1.

The rule was filed and became effective on June 23, 1978 as *R.* 1978 d. 213.

[2]The age or duration of a given pregnancy is measured in terms of weeks by either of two methods. By the first (and more widely used method), the physician counts the number of weeks from the date of the woman's last menstrual period. By the second, or "gestational weeks" method, the physician counts the number of weeks from the time of "gestation" which means that the woman actually became pregnant approximately two weeks after her last menstrual period. This latter determination is generally made through examination by ultrasonography. Thus, a pregnancy of "16 menstrual weeks" corresponds directly to one of "14 gestational weeks." According to Dr. Michael Burnhill, Associate Professor of Obstetrics and Gynecology at Johns Hopkins University Medical School, the "menstrual weeks" method is subject to considerably greater error than "gestational weeks" measurement, as the former depends for its accuracy upon the patient's recollection of when her last menstrual period occurred.

abortion. They assert that in reviewing the rule in controversy we as an appellate court must apply a "strict scrutiny" test rather than a "rational relation" test.

██ Addressing first the attack on procedural invalidity, we find this claim to be without merit. It appears from the minutes of the Board's regular meeting on May 10, 1978 that a proposed form of the rule was adopted by the Board after ratification of certain amendments and "minor changes." The amended rule was then forwarded to the Office of the Attorney General for a final review, as noted in the minutes:

> Following approval of the amendments the Board, upon motion made and duly seconded authorized the Office of the Attorney General to file the amended rule with the Division of Administrative Procedure or re-publish the rule if the Office of the Attorney General determines re-publication would be necessary.

The Attorney General thereafter suggested several changes in language and sentence structure, as well as the deletion of a "reporting" requirement contained in paragraph (d).[3] In all other respects, however, the substantive provisions affecting the performance of second trimester abortions remained intact. At its June 21, 1978 meeting, the Board expressly adopted and "ratified" these recommended changes as their own, and authorized "publication" of the rule.

Based on the record before us, we cannot accept the argument that the Attorney General usurped the Board's legislatively-prescribed function to make rules governing the practice of medicine. See *N. J. S. A.* 45:9–2 *et seq.* The

---

[3]Paragraph (d), which was deleted by the Board on the Attorney General's recommendation, read as follows:

(d) Hospitals and licensed outpatient facilities shall submit to the State Department of Health quarterly reports listing the number and type of procedures performed during first and second trimester pregnancy, including morbidity and mortality for each trimester. All such reports must observe patient anonymity. Licensed outpatient facilities shall submit to the department a current listing of the name and location of affiliated hospital(s).

Board had previously authorized that the rule be filed as one "finally adopted." The Board's acceptance of minor structural changes, which did not alter the operative terms of the rule, can only be construed as an adoption of the rule as final. Moreover, the direction to "re-publish" the rule in this context clearly suggests that publication of a final rule was intended. See also, *N. J. A. C.* 15:15–3.2 and 3.3.

■ The second prong of appellants' challenge rests on federal constitutional principles. As a threshold matter, it now is well-settled that a woman's right to an abortion during the first trimester of her pregnancy is a "fundamental" one. *Roe v. Wade,* 410 *U. S.* 113, 163, 93 *S. Ct.* 705, 35 *L. Ed.* 2d 147 (1973), reh. den. 410 *U. S.* 959, 93 *S. Ct.* 1409, 35 *L. Ed.* 2d 694 (1973) ; *Doe v. Bolton,* 410 *U. S.* 179, 93 *S. Ct.* 739, 35 *L. Ed.* 2d 201 (1973), reh. den. 410 *U. S.* 93 *S. Ct.* 1410, 35 *L. Ed.* 2d 694 (1973) ; *Doe v. Bridgeton Hospital Ass'n, Inc.,* 71 *N. J.* 478, 490 (1976), *cert.* den. 433 *U. S.* 914, 97 *S. Ct.* 2987, 53 *L. Ed.* 2d 1100 (1977). However, this fundamental constitutional right is neither "unqualified," 410 *U. S.* at 154, 93 *S. Ct.* 705, nor "absolute," 410 *U. S.* at 189, 93 *S. Ct.* 705, for the duration of pregnancy to term. Indeed, the Supreme Court recognized in *Roe v. Wade* that

> * * * the risk to the woman increases as her pregnancy continues. Thus, the State retains a definite interest in protecting the woman's own health and safety when an abortion is proposed at a late stage of pregnancy. [*Roe v. Wade,* 410 *U. S.* at 150, 93 S. Ct. 725]

Beyond the first trimester, then, the State has a "compelling interest" in the health and safety of the mother, and by reason of that interest the State may promulgate rules which are "reasonably relate[d] to the preservation and protection of maternal health." *Roe v. Wade, supra,* 410 *U. S.* at 163, 93 *S. Ct.* 732.

■ Here, the State's (and the Board's) interest has clearly reached the "compelling" point, given the fact that

*N. J. A. C.* 13:35–7.2 purports only to regulate abortion procedures beyond the first trimester. Our review is therefore confined to the issue of whether the "Termination of Pregnancy Rule" is both "reasonably related to maternal health," and "narrowly drawn to express only the legitimate interests at stake." *Roe v. Wade, supra* at 155, 93 *S. Ct.* 728: *Griswold v. Connecticut,* 381 *U. S.* 479, 485, 85 *S. Ct.* 1678, 14 *L. Ed.* 2d 510 (1964) ; *Aptheker v. Secretary of State,* 378 *U. S.* 500, 508, 84 *S. Ct.* 1659, 12 *L. Ed.* 2d 992 (1964). This is not to say that the rule before us is not entitled to the presumption of validity normally accorded to a rule enacted by an administrative agency. See, *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N. J.* 544, 560–563 (1978) ; *Garden State Comm. Hosp. v. State Bd. of Med. Exam.,* 147 *N. J. Super.* 592 (App. Div.), certif. den. 74 *N. J.* 283 (1977). We simply mean that, to the extent that a federal constitutional right is implicated, this court will closely examine the rule to determine whether the Board's action is both "reasonably related" and narrowly circumscribed to avoid undue infringement.

■ Based upon our careful review of the testimony taken at public hearing, as well as the exhaustive documentation presented to the Board, we hold that *N. J. A. C.* 13:35–7.2 is constitutional and a valid exercise of the Board's rule-making authority. As originally proposed, the rule would have limited *all* second trimester abortions to performance in hospitals on an inpatient basis, regardless of the medical procedure employed. The Board was directed to reconsider this position and hold public hearings on the proposed rule by order of this court.

In its present form the rule allows licensed outpatient clinics to perform "dilatation and evacuation" abortions through 16 menstrual weeks and/or 14 gestational weeks. This expansion upon the rule as originally promulgated clearly responds to sound medical evidence presented to the Board, attesting to that procedure's safety during the early

part of the second trimester. Indeed, the Board found, and the evidence demonstrated, that "D & E" abortions are the safest of all available methods for the second trimester.[4]

The rule, however, prohibits outpatient clinics from performing second trimester abortions by any alternative procedures, including that method commonly known as "saline instillation." It is apparent from the record that the saline technique has been a predominant method for termination of second trimester pregnancies in the United States, although studies do not reflect its use on a hospital or nonhospital basis.[5] In the briefs before this court and at oral argument the controversy focused on whether the "16/14 week" cut-off date (for outpatient "D & E" abortions) and the proscription against second trimester outpatient saline abortions constitute reasonable regulations. The evidence offered in this regard, particularly as to medical safety, was at best conflicting. According to one national study, the mortality rates almost double in the transition weeks from first to second trimester, rising from 3.6 deaths per 100,000 at 11–12 gestational weeks to 7.0 deaths per 100,000 at 13–15 weeks. The death rate jumps dramatically in the latter part of the second trimester to 19 per 100,000 at 16 gestational weeks or later.

The testimony and documentary evidence, moreover, indicated that abortions by the "saline instillation" method

---

[4]The other recognized methods for second trimester abortions include saline instillation, delatation and curettage, hysterectomy, hysterotomy and injection of prostaglandin hormone.

[5]According to a 1974 study by the Center for Disease Control, saline abortions accounted for 53% of abortions performed in the second trimester, i. e., at 13 menstrual weeks or later. We also note that in *Planned Parenthood v. Danforth*, 428 *U. S.* 52, 77, 96 *S. Ct.* 2831, 2845, 49 *L. Ed.* 2d 788 (1976), the Supreme Court found that saline amniocentesis is an "accepted medical procedure in this country" and "is employed in a substantial majority (the testimony from both sides ranges from 68% to 80%) of all post-first trimester abortions." Neither source provides a breakdown between hospital and nonhospital performance.

presented significantly greater risk frequency for complications, principal among those being hemorrhaging, infection, fever, perforation of the cervix or uterine wall, and retained products of conception (requiring additional surgical procedure for removal). The saline technique presented other extrinsic risks when performed on an outpatient basis. Normally, after instillation of the saline solution at the clinic, the patient is sent home to await the onset of labor. During this period there is neither direct supervision nor monitoring of the patient for complications or symptoms thereof. The patient has no assurances of timely diagnosis of morbid symptoms, no emergency facilities or operating room immediately at hand, and no guarantee of hospital admission if and when necessary. Dr. James Jones, presently affiliated with New Jersey's medical college, reported from his seven years' experience with New York State abortion programs that both mortality and complications rates were reduced dramatically after that State began to enforce an "in-hospital" requirement for all abortions beyond the twelfth week. The improvement was directly attributed to the hospital's superior facilities for early diagnosis of complications, continuity of care and on-site emergency treatment capability.

By way of contrast, we note the remarkable safety record presented by MMA in its performance of saline abortions. With a *zero* mortality rate and favorable rates for complications, the record was "impressive," in the words of one Board member. Additionally, the experience of an outpatient clinic in the State of Washington reflects a similar impressive mortality rate.

The Board was therefore faced with competing expert medical opinions and data upon which to make its findings. Obviously, the factual record was not so compelling as was presented in *Roe v. Wade, supra,* where the safety of first trimester abortions was found to be a "well established medical fact." 410 *U. S.* at 149, 163, 93 *S. Ct.* 705. There was, nevertheless, more than sufficient credible evidence

upon which the Board could act, and in light of the conflicting nature of the proofs, we are constrained to defer to its expertise in evaluating the testimony. *Cf. In re Weston*, 36 *N. J.* 258, 264 (1962), *cert.* den. 369 *U. S.* 864, 82 *S. Ct.* 1029, 8 *L. Ed.* 2d 84 (1964). It further appears that the regulation complies with the directive of *Roe v. Wade, supra*, that

> * * * Examples of permissible state regulation in this area are requirements * * * as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status * * *. [410 *U. S.* at 163, 93 S. Ct. 732]

It is our view that the rule's limitation on outpatient performance to early "D & E" abortions is reasonably related" to maternal health, especially in light of the unsettled state of medical opinion as to the safety of alternative procedures in the late second trimester.

Appellants' final argument that the "in-hospital" restriction will effectively bar many needed second trimester abortions is equally unavailing. We are not unmindful of the estimated "need," found by the Board to range from 5,000 to 7,000 second trimester abortions annually. There is also the problem of admittedly higher hospital costs for inpatient procedures, which will restrict young and poor women from obtaining treatment. It does not follow, however, that the Board must advocate a rule which in its opinion would be deleterious to maternal health. As the Supreme Court explained in *Maher v. Roe*, 432 *U. S.* 464, 474, 97 *S. Ct.* 2376, 2383, 53 *L. Ed.* 2d 484 (1977), "[t]he indigency that may make it difficult — and in some cases, perhaps, impossible — for some women to have abortions is neither created nor in any way affected" by the regulation. In fact, the present rule does not effectively inhibit *all* second trimester abortions. *Cf. Planned Parenthood v. Danforth*, 428 *U. S.* 52, 77, 96 *S. Ct.* 2831, 49 *L. Ed.* 2d 788 (1976). Rather, it appears that the rule as enacted will allow for

the majority of second trimester abortions, which evidently fall within the early second trimester.

In view of all of the foregoing, it is our conclusion that *N. J. A. C.* 13 :35–7.2 is valid in that it was validly adopted by the Board of Medical Examiners and is reasonably related to maternal health.