743 F.2d 352
 BIRTH CONTROL CENTERS, INC.; East Gyn. Center, Inc.;
Northland Family Planning Clinic, Inc.; Northland Family
Planning Clinic West, Inc.; Leon A. Hockman, M.D.; Richard
Goldfine, M.D.; Julio B. Acosta, M.D.; Enrique B. Gerby,
M.D.; Youl Choi, M.D., Plaintiffs-Appellants, Cross-Appellees,
v.
Maurice S. REIZEN, M.D., Director, Michigan Department of
Public Health, Defendant-Appellee, Cross-Appellant.
 Nos. 81-1163, 81-1306.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 2, 1983.
Decided Aug. 30, 1984.
Rehearing and Rehearing En Banc Denied Oct. 24, 1984.
 
 1
 Bette Huster, Detroit, Mich., Frank Susman, argued, Susman, Schermer, Rimmel & Parker, St. Louis, Mo., for plaintiffs-appellants, cross-appellees.
 
 
 2
 Frank J. Kelley, Atty. Gen. of Mich., Walter V. Kron, Asst. Atty. Gen., argued, Lansing, Mich., for defendant-appellee, cross-appellant.
 
 
 3
 Before MERRITT and WELLFORD, Circuit Judges, and HORTON, District Judge.*
 
 
 4
 HORTON, District Judge.
 
 
 5
 In 1978, the State of Michigan enacted a Public Health Code and implementing regulations, which together, provide a comprehensive legal framework regulating all freestanding surgical outpatient facilities (FSOF), including abortion clinics, in the State of Michigan. Plaintiffs, four clinics offering first trimester abortions and five physicians who regularly perform first trimester abortions in these clinics, challenged on due process and equal protection grounds the constitutionality of various provisions of the Michigan Public Health Code, Public Act 368 of 1978, and the regulations promulgated thereunder, applicable to abortion clinics and the performance by physicians of abortions in these clinics.
 
 
 6
 This action was brought under 42 U.S.C. Sec. 1983, against the Governor of the State of Michigan, the Attorney General of the State of Michigan and the Director of the Michigan Department of Public Health seeking both declaratory and injunctive relief. The trial court upheld the constitutionality of Michigan's statutory scheme and held valid all but two of the implementing regulations.[1] The plaintiffs/appellants/cross appellees appealed the trial court's decision finding the statute and regulations valid; the defendants/appellees/cross appellants have appealed that portion of the trial court's ruling which found one regulation constitutionally unsound.[2]
 
 
 7
 We affirm the trial court's ruling that the State of Michigan did not violate the plaintiff's equal protection rights by regulating freestanding surgical outpatient facilities where abortions are performed while not regulating physicians' private offices where abortions are performed.
 
 
 8
 We affirm the trial court's holding that plaintiffs failed to establish such selective enforcement of the FSOF licensing scheme as would amount to a violation of the plaintiffs' equal protection rights.
 
 
 9
 We affirm the trial court in holding that Rule 33 (counseling and referrals), Rule 47 (medical records), and Rule 35 (physician qualifications) do not violate the constitutional rights of plaintiffs or their patients.
 
 
 10
 We affirm the trial court's ruling that Rule 68(8) (six foot corridors) is not reasonably related to a legitimate State interest.
 
 
 11
 We vacate the trial court's determination that Rule 38 (review of medical records) and the staffing, structural and equipment regulations do not unduly burden a woman's right to abortion. Rather, we find that Rules 26(2), 35(3), 57(6), 66, 67 and 68 have a significant impact on a woman's right to terminate her first trimester pregnancy, and, therefore hold these regulations unconstitutional.
 
 
 12
 We vacate the trial court's determination that Rule 38 (review of medical records) does not unduly burden a woman's right to abortion. This regulation is remanded for further fact-finding and consideration in accordance with this opinion.
 
 
 13
 Finally, we vacate the trial court's findings with respect to Rule 51 (regulation of second trimester abortions) and hold that Rule 51 is an unconstitutional violation of a woman's due process right to terminate her pregnancy free of State interference.
 
 
 14
 The plaintiff abortion clinics and physicians challenge the Michigan regulatory scheme on both federal equal protection and due process grounds. The plaintiffs contend:
 
 
 15
 1. The process by which freestanding surgical outpatient facilities (FSOFs) are singled out for regulation while other facilities that perform similar surgical procedures (such as physicians' private offices) are not subject to such regulation violates the plaintiffs' rights under the equal protection clause of the fourteenth amendment.
 
 
 16
 2. Through the mechanism of selective enforcement, the State is disproportionally applying the FSOF regulations to abortion clinics (rather than to all freestanding surgical outpatient facilities) and that this selective enforcement is a violation of the plaintiffs' equal protection rights.
 
 
 17
 3. The legislation governing freestanding surgical outpatient facilities is an impermissible regulation of first trimester abortions in violation of their patients' fourteenth amendment due process rights to choose to terminate their pregnancies free of State interference.
 
 
 18
 See 508 F.Supp. at 1370.
 
 
 19
 The State contends the Michigan statutes and regulations governing FSOFs seek to regulate all FSOFs, not just abortion clinics, and therefore the legislation is legitimately related to the State's interest in the health of its citizens. The State contends:
 
 
 20
 1. The legislation's distinction between FSOFs and physicians' private offices is rationally related to a valid State purpose and therefore does not violate the plaintiffs' equal protection rights.
 
 
 21
 2. The State has not sought to enforce the FSOF licensing requirements against only abortion clinics rather than against all freestanding surgical outpatient facilities; therefore, the State has not engaged in selective enforcement in violation of the plaintiffs' equal protection rights.
 
 
 22
 3. The legislation is not an impermissible State interference with a woman's fundamental right to a first trimester abortion because the legislation does not require abortions to be performed in FSOFs and because compliance with the legislation does not result in an increase to patients in the cost of abortions.
 
 I. Michigan's statutory scheme
 
 23
 Michigan Public Act 368 of 1978 defines a freestanding surgical outpatient facility as:
 
 
 24
 a facility, other than the office of a physician, dentist, podiatrist, or other private office, offering a surgical procedure and related care that in the opinion of the attending physician can be safely performed without requiring overnight inpatient hospital care. It does not include a surgical outpatient facility owned by and operated as part of a hospital.
 
 
 25
 Mich.Comp.Laws Sec. 333.20104(5).
 
 The State of Michigan requires that a FSOF
 
 26
 (a) Be organized, administered, staffed, and equipped to provide on a regular and scheduled basis major and minor surgical procedures outside a hospital which in a physician's judgment may be safely performed on a basis other than on an inpatient basis.
 
 
 27
 (b) Have the physician, professional nursing, technical, and supportive personnel; the technical, diagnostic, and treatment services; and the equipment necessary to assure the safe performance of surgery and related care undertaken in the facility.
 
 
 28
 (c) Have a written agreement with a nearby licensed hospital to provide for the emergency admission of post-surgical patients who for unpredictable reasons may require hospital admission and care.
 
 
 29
 (d) Assure that a clinical record is established for each patient including a history, physical examination, justification for treatment planned and rendered, tests and examinations performed, observations made, and treatment provided.
 
 Mich.Comp.Laws Sec. 333.20821
 
 30
 The legislation requires that all FSOFs obtain a license from the Michigan Department of Public Health. Under this plan, the department has developed an extensive set of regulations setting forth the criteria that FSOFs must satisfy in order to obtain the required license. The department has also promulgated rules to differentiate between a FSOF, which must be licensed, and the private office of a practicing physician, which is not required to be licensed.
 
 II. Equal Protection
 
 31
 The plaintiff abortion clinics and physicians contend the FSOF licensing scheme violates their fourteenth amendment right to equal protection of the laws by impermissibly differentiating between FSOFs and the private offices of physicians. To be licensed as an FSOF (and thus to lawfully perform first trimester abortions), abortion clinics must comply with staffing, structural, equipment, counseling, consent, and record keeping requirements. In contrast, physicians performing medically identical abortion procedures in their private offices are subject to none of these regulations.
 
 
 32
 Determining whether this obviously unequal treatment violates the plaintiffs' equal protection rights involves first ascertaining whether a suspect classification or fundamental interest is involved and then, based on this determination, applying either strict scrutiny or a rational relationship analysis to the challenged legislation.
 
 
 33
 Noting that the physician plaintiffs, in their equal protection argument, were raising their own equal protection rights, not the due process rights of their patients, the trial court found the State's differentiation between FSOFs and physicians' private offices did not involve any suspect class[3] nor implicate any fundamental right. 508 F.Supp. at 1385-86. Consequently, the trial court applied the rational basis standard of review and upheld the legislation's classification. Id. at 1387. We agree with the trial court that the rational basis test is the appropriate standard of review.
 
 
 34
 No suspect classification is involved here since the State has chosen to regulate all FSOFs, not just abortion clinics.[4] The analysis of whether a fundamental right is affected by the distinction between a physician's office and an FSOF is more difficult. If compliance with the FSOF licensing requirements forced abortion clinics either to increase dramatically their charges for performing abortions or if the cost of compliance was so prohibitive that they ceased to perform abortions, then a woman's ability to exercise her fundamental right to choose to terminate her pregnancy would be seriously impaired.[5] But plaintiffs misperceive the nature of the relationship between the statutory classification and the fundamental right to an abortion. The plaintiffs have standing to assert their patients' due process rights, see Doe v. Bolton, 410 U.S. 179, 188-89, 93 S.Ct. 739, 745-46, 35 L.Ed.2d 201 (1973), but we are not aware of any authority that allows plaintiffs to use their patients' due process rights as a means of elevating the standard of review for their own equal protection rights. We conclude, as did the trial court, that strict scrutiny is not appropriate and that the statutory distinction between FSOFs and physicians' private offices is valid if it is "reasonable, not arbitrary, and [rests] upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Reed v. Reed, 404 U.S. 71, 75-76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (quoting Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920)). See 508 F.Supp. at 1385. At trial the district judge focused on the development of this issue and closely questioned witnesses about the rationale behind the differentiation. See, e.g., 6/6/80, Tr. at 334-344, 410-424; 6/20/80, Tr. at 18-43.
 
 
 35
 The trial court concluded the FSOF licensing plan was enacted by the State in response to a sincere desire to protect the health of its citizens. While the legislature, in devising FSOF legislation, may have focused on abortion clinics, the trial court found that the State enacted the FSOF licensing and regulatory scheme for the purpose of assuring minimum standards of health and safety in all FSOFs, not for the purpose of limiting the availability of abortions. 508 F.Supp. at 1386 and 1372 n. 8. The trial court found, based on the evidence, that physician responsibility may differ depending upon the setting in which a physician practices. Id. at 1386. For example, the district court found that in a private office practice the physician will likely have direct control over the staff and the functioning of the office, but in a clinic owned and operated by lay personnel, physicians may be mere employees lacking control over other areas of the clinics' functioning "such as the hiring, training and supervision of support personnel, the acquisition of medical equipment, or ... design of the facility." Id. (footnote omitted). Since these factual findings are not clearly erroneous and do indicate a reasonable basis for the State's decision to regulate FSOFs where abortions are performed, while not regulating physicians' private offices where abortions are performed, we affirm the trial court's ruling that the statutory classification does not violate the plaintiffs' equal protection rights.
 
 III. Selective enforcement
 
 36
 The plaintiffs contend that, although the FSOF licensing plan may be neutral on its face, state officials have enforced the licensing regulations against only freestanding surgical outpatient facilities that perform abortions and have not required other freestanding surgical outpatient facilities to comply with the licensing scheme. Such selective enforcement, if proven to be true, would violate plaintiffs' fourteenth amendment right to equal protection of the laws. Yick Wo v. Hopkins, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 1072-73, 30 L.Ed. 220 (1886). Based on the evidence produced at trial, the trial court found plaintiffs failed to satisfy their burden of proof on the selective enforcement allegations. 508 F.Supp. at 1308.
 
 
 37
 In order to establish selective enforcement of FSOF licensing regulations that rises to the level of a violation of their equal protection rights, the plaintiffs must prove intentional, purposeful discrimination. Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944); Yick Wo v. Hopkins, 118 U.S. at 374-75, 6 S.Ct. at 1073; Friedlander v. Cimino, 520 F.2d 318, 320 (2nd Cir.1975); Delia v. Court of Common Pleas of Cuyahoga County, 418 F.2d 205, 206 (6th Cir.), cert. denied, 396 U.S. 886, 90 S.Ct. 174, 24 L.Ed.2d 161 (1969). Here, the burden was on plaintiffs to prove discriminatory enforcement by showing "clear and intentional discrimination." Snowden v. Hughes, 321 U.S. at 8, 64 S.Ct. at 401 (citations omitted).
 
 
 38
 Discriminatory intent is a factual matter subject to Rule 52(a)'s clearly erroneous standard. Pullman-Standard v. Swint, 456 U.S. 273, 293, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66 (1982). In this case, the trial court found that although the State's method of identifying potential FSOF licensees by a search of telephone directories' yellow pages might indicate a lack of thoroughness, and although the determination of whether a facility was an FSOF or a physician's private office was highly discretionary, the plaintiffs had not proved that the State intentionally, discriminatorily selected abortion clinics for FSOF licensure. 508 F.Supp. at 1388-89. Evidence at trial showed the State identified thirty-six potential FSOF licensees (Yerian, 6/6/80, Tr. at 404), and thirty of those thirty-six were abortion clinics (5/29/80, Tr. at 151-52). At the time of trial, seventeen of the thirty-six potential FSOFs had been licensed (Yerian, 6/6/80, Tr. at 404). Of these seventeen licensed FSOFs, eleven are abortion clinics and six are not (Kron, 5/29/80, Tr. at 150). Having reviewed the record, we cannot say the trial court's finding that the State did not selectively enforce the FSOF regulations against abortion clinics is clearly erroneous. Therefore, we affirm the trial court's holding that plaintiffs' equal protection rights were not violated by selective enforcement of the FSOF legislation.
 
 IV. Due process
 
 39
 A. The legal nature of a woman's right to terminate her pregnancy.
 
 
 40
 We turn now to plaintiffs' contentions that the FSOF licensing scheme violates their patients' due process right to terminate their pregnancies free of State interference. Because of the continued evolution in the law regarding abortions, we review the legal nature of this constitutional right before turning to the facts in this case.
 
 
 41
 The Supreme Court recognized in Roe v. Wade that "the right of privacy ... founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action ... is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." 410 U.S. 113, 153, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973). However, a woman's constitutionally protected right to choose to terminate her pregnancy by abortion is not an absolute right; rather, it "must be considered against important state interests" in regulating abortion. City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416 103 S.Ct. 2481, 2491, 76 L.Ed.2d 687 (1983); Roe v. Wade, 410 U.S. at 154, 93 S.Ct. at 727. Because the right to choose abortion is a fundamental right, any state regulation restricting a woman's right to choose abortion "must be supported by a compelling state interest." Akron, 103 S.Ct. at 2491; Roe v. Wade, 410 U.S. at 155, 93 S.Ct. at 727.
 
 
 42
 The Supreme Court has recognized two compelling state interests that will justify State regulation of abortion:
 
 
 43
 First, a State has an "important and legitimate interest in protecting the potentiality of human life." Although this interest exists "throughout the course of the woman's pregnancy," it becomes compelling only at viability, the point at which the fetus "has the capability of meaningful life outside the mother's womb." At viability this interest in protecting the potential life of the unborn child is so important that the State may proscribe abortions altogether, "except when it is necessary to preserve the life or health of the mother."
 
 
 44
 Second, because a State has a legitimate concern with the health of women who undergo abortions, "a State may properly assert important interests in safeguarding health [and] in maintaining medical standards." ... (T)his health interest does not become compelling until "approximately the end of the first trimester" of pregnancy. Until that time, a pregnant woman must be permitted, in consultation with her physician, to decide to have an abortion and to effectuate that decision "free of interference by the State."
 
 
 45
 Akron, 103 S.Ct. at 2491-92 (citations omitted) (footnote omitted).
 
 
 46
 Subsequent to its decision in Roe v. Wade, the Supreme Court has several times found it necessary to evaluate state regulations that in some way affect a woman's ability to exercise her fundamental right to terminate her pregnancy. See City of Akron v. Akron Center for Reproductive Health, supra; Planned Parenthood v. Ashcroft, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983); Simopoulos v. Virginia, 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983); Bellotti v. Baird, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); Connecticut v. Menillo, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975); Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).
 
 
 47
 In Akron, one of its most recent abortion decisions, the Supreme Court rearticulated the guidelines for permissible state regulation of abortion. These guidelines control the analysis of the Michigan legislation being challenged here.
 
 
 48
 Akron teaches that during the first trimester of pregnancy the State may impose only regulations that have "no significant impact on the woman's exercise of her right [to abort]," and even these "minor regulations ... may not interfere with physician-patient consultation or with the woman's choice between abortion and childbirth." Akron, 103 S.Ct. at 2492-93 (emphasis added). Furthermore, these insignificant regulations must further "important state health objectives," and the burden of demonstrating this rests on the State. Id. 103 S.Ct. at 2493.
 
 
 49
 "From approximately the end of the first trimester of pregnancy, the State 'may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health.' " Akron, 103 S.Ct. at 2493 (quoting Roe v. Wade, 410 U.S. at 163, 93 S.Ct. at 731) (footnote omitted).
 
 
 50
 Examples of permissible state regulation [during the first trimester] are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like.
 
 
 51
 Roe v. Wade, 410 U.S. at 163, 93 S.Ct. at 732.
 
 
 52
 But even a second trimester abortion regulation that is reasonably related to maternal health cannot stand if it departs from accepted medical practice. Akron, 103 S.Ct. at 2495. If a State requires the licensing of facilities that perform abortions or undertakes to regulate the performance of abortions after the first trimester, then "the health standards adopted must be 'legitimately related to the objective the State seeks to accomplish.' " Akron, 103 S.Ct. at 2493 (quoting Doe v. Bolton, 410 U.S. at 195, 93 S.Ct. at 749).
 
 B. Plaintiffs' due process claims
 
 53
 The trial court separately analyzed several individual provisions of the challenged legislation and found, with one minor exception, Michigan's licensing requirements for FSOFs do not "individually or collectively, unduly burden a woman's right to seek an abortion." 508 F.Supp. at 1389. The district court then upheld the FSOF regulations as "rationally related to the State's legitimate interest in assuring adequate standards of health care in facilities where outpatient surgery is performed." Id.
 
 
 54
 In accordance with Akron, we find that, in asking whether the regulations "unduly burdened" a woman's right to obtain an abortion, the trial court applied an inappropriate analysis. As the Supreme Court's recent decision in Akron has made clear, the appropriate approach in evaluating State regulations touching on a woman's right to an abortion during the first trimester of pregnancy is to ascertain whether the restrictive regulations have a significant impact on the woman's exercise of this right. Akron, 103 S.Ct. at 2492-93. Only if the regulations have "no significant impact" on a woman's exercise of her fundamental right to choose to terminate her pregnancy during the first trimester can the regulation be sustained. Id. at 2492. In order to apply the "no significant impact" standard articulated by the Supreme Court in Akron, it is necessary to reevaluate the validity of Michigan's FSOF regulations as applied to abortion clinics.
 
 
 55
 1. Legislation affecting first trimester abortions
 
 
 56
 The Michigan plan to license FSOFs proposes to regulate all freestanding surgical outpatient facilities, not just abortion clinics. Sec. 20104(5). Nevertheless, because they apply to facilities performing first trimester abortions, the regulations must be evaluated to determine whether they have a significant impact on a woman's exercise of her fundamental right to choose abortion. If there is no significant impact on this right and if the State has met its burden of demonstrating the "regulations furthered important health-related State concerns," then the legislation will be upheld. Akron, 103 S.Ct. at 2493.
 
 
 57
 (a) Rule 33: Counseling and referrals for subsequent care
 
 
 58
 Rule 33 of the regulations requires that when "procedures having present or future social implications for a patient are performed, such as ... pregnancy terminations, ... a facility shall make available and offer appropriate counseling, interpretation and referral for subsequent indicated care." R. 325.3833 (Rule 33). The plaintiffs contend the State has utilized the counseling requirement to impermissibly probe into a woman's feelings about her decision to abort and that the imposition of counseling upon every woman seeking an abortion is an inappropriate interference with the woman's right of privacy. The trial court found Rule 33 did not "unduly burden" a woman's right to terminate her pregnancy and upheld the rule as "rationally related to a legitimate state interest in insuring informed consent." 508 F.Supp. at 1376. Under Akron, however, the analysis of Rule 33 does not now depend on whether Rule 33 unduly burdens a woman's right to terminate her first trimester pregnancy, but, rather, hinges on whether the rule has any significant impact on a woman's freedom to exercise this right.
 
 
 59
 A State may require a woman, before undergoing even a first trimester abortion, to certify in writing her consent to the abortion procedure. Planned Parenthood v. Danforth, 428 U.S. 52, 67, 96 S.Ct. 2831, 2840, 49 L.Ed.2d 788 (1976). The State's imposition of this written consent requirement is based on the fact that "[t]he decision to abort ... is an important, and often stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and consequences." Id.
 
 
 60
 Such informed consent is defined to mean "the giving of information to the patient as to just what would be done and as to its consequences," id. at 67 n. 8, 96 S.Ct. at 2840 n. 8, and in the abortion context, it is narrowly construed. The State may not attempt to influence a woman's choice between abortion and childbirth under the guise of informed consent counseling. Akron, 103 S.Ct. at 2500-01. Nor may the State require that only a physician do preabortion counseling. Id. 103 S.Ct. at 2502-03. The State may "define the physician's responsibility to include verification that adequate counseling has been provided and that the woman's consent is informed," and a State can establish "reasonable minimum qualifications for those people who perform the primary counseling function." Id. 103 S.Ct. at 2502-03 (footnotes omitted).
 
 
 61
 Michigan's Rule 33 does not attempt to dictate the content of any preabortion counseling nor does it seek to influence the woman's decision toward either childbirth or abortion. The trial court found from the evidence at trial FSOFs were not required to counsel every woman seeking an abortion, but rather were required only to make counseling available. 508 F.Supp. at 1375. This appears consistent with the Supreme Court's view that since the need for information and/or counseling varies with the patient, individual counseling should be available to those who need it. Akron, 103 S.Ct. at 2502 n. 38. The trial court's analysis makes it clear Rule 33's requirement that an FSOF make counseling available to its abortion patients has no significant impact on a woman's exercise of her right to obtain an abortion, and we agree with the trial court that Rule 33 is rationally related to a legitimate State interest in health. Therefore, we affirm the trial court's finding that Rule 33 on its face is constitutionally valid.
 
 
 62
 In upholding Rule 33, we take special note of the trial court's admonition to the Michigan Department of Public Health that "the State should refrain from imposing requirements regarding the content of the counseling sessions or the retention of a counselor's notes." 508 F.Supp. at 1377. "It remains primarily the responsibility of the physician to ensure that appropriate information is conveyed" to the woman seeking an abortion, and the physician must have the freedom to gauge the informational and counseling needs of each individual patient. Akron, 103 S.Ct. at 2500. Even informal attempts by health department officials to influence the extent or specific content of the preabortion counseling required to be made available by FSOFs would be an impermissible State interference.
 
 
 63
 (b) Rule 47: Medical records
 
 
 64
 Regulations 47(5) and 47(6), occasionally referred to in the trial court opinion as 45(5) and 45(6), apply only to FSOFs where abortions are performed; they require that FSOFs file reports and statistical information with the health department. A half-page "abortion report" must be completed for every abortion performed at the FSOF and then the form must be signed by the physician who performed the abortion. The abortion form does not reveal the patient's name.
 
 
 65
 We agree with the conclusion of the trial court that these reporting requirements "do not violate the constitutional rights of any of the plaintiffs or their patients, and are rationally related to a legitimate governmental interest in gathering statistical information to protect the health of its citizens." 508 F.Supp. at 1380. The guidelines laid down by the Supreme Court in Danforth, supra, dictate this result.
 
 
 66
 In Danforth the Supreme Court upheld Missouri's record keeping and reporting requirements even for first trimester abortions. Because the Missouri record keeping and reporting had "no legally significant impact or consequence on the abortion decision or on the physician-patient relationship," and because they reasonably furthered the State's interest in protecting the health of its female citizens, the Court was willing to find the requirements constitutionally valid as long as the State did not utilize them "in such a way as to accomplish, through sheer burden of recordkeeping detail, ... an otherwise unconstitutional restriction." Planned Parenthood v. Danforth, 428 U.S. at 81, 96 S.Ct. at 2847.
 
 
 67
 The amount of paperwork imposed by Rule 47(5) and 47(6) is minimal and appears to involve very little time or expense. From the record and from the trial court's opinion, it is clear Rule 47(5) and 47(6) have no significant impact on a woman's exercise of her right to choose to terminate her pregnancy. The trial court found Michigan's important health related concerns are furthered by gathering the data required by the rule. Therefore, we uphold the trial court and find Rule 47(5) and 47(6) valid.
 
 
 68
 Two of the plaintiff physicians contend that requiring the physician who performs the abortion to sign the abortion report violates the physician's own right to privacy. We agree with the trial court that in the situation presented here there is no merit to this claim. "Where an individual or corporation engages in occupations in which the public has an interest, that occupation may be regulated under the police power of the State." United States v. Tehan, 365 F.2d 191, 194 (6th Cir.1966) (citing Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934)), cert. denied, 385 U.S. 1012, 87 S.Ct. 716, 17 L.Ed.2d 548 (1967). We do not believe the right of privacy extends to the boundaries urged here by plaintiff. Cf. Whalen v. Roe, 429 U.S. 589, 598-604, 97 S.Ct. 869, 875-878, 51 L.Ed.2d 64 (1977).
 
 
 69
 (c) Rule 35: Only physicians may perform abortions at FSOFs
 
 
 70
 Rule 35(1) provides that a physician performing surgery at an FSOF must "possess adequate qualifications acquired by special training and experience to evaluate the medical ... conditions, potential risks, recognize and adequately treat emergency complications encountered in any procedure undertaken, and perform the procedure in accordance with the usual standards of medical ... practice." R. 325.3835 (Rule 35 At trial, the State clarified Rule 35(1)'s requirement that only a physician possessing "qualifications acquired by special training" could perform surgery at an FSOF. According to the testimony of the State's witnesses, Rule 35(1) only requires that a physician "be qualified to do whatever he or she undertakes; " the rule does not require that only a specialist perform abortions. 508 F.Supp. at 1377. Based on this interpretation of Rule 35(1) we agree with the trial court. Michigan may constitutionally insist that only properly licensed physicians be permitted to perform abortions at FSOFs.
 
 
 71
 Even in the first trimester of pregnancy the State's interest in maternal health is sufficient to justify a requirement that an abortion may be performed only "by medically competent personnel." Connecticut v. Menillo, 423 U.S. 9, 11, 96 S.Ct. 170, 171, 46 L.Ed.2d 152 (1975). As the Supreme Court made explicit in Roe v. Wade, a "State may define the term 'physician' ... to mean only a physician currently licensed by the State, and may proscribe any abortion by a person who is not a physician as so defined." 410 U.S. at 165, 93 S.Ct. at 732. We therefore uphold Rule 35(1) as interpreted by the trial court.
 
 
 72
 (d) Rules 26(2), 35(3), 57(6), 66, 67, 68: Staffing, structural and equipment regulations
 
 
 73
 The plaintiffs object to a number of detailed, specific criteria governing the staffing, physical layout and equipment required for FSOF licensure. Although plaintiffs contend compliance with these regulations would be costly, the trial court found the regulations did "not unduly burden a woman's right to seek an abortion" and then upheld the regulations as reasonably related to the State's legitimate purpose of protecting the health and safety of its citizens. 508 F.Supp. at 1384.
 
 
 74
 Again, we believe that in utilizing the "unduly burdensome" standard to evaluate these regulations the trial court employed an analysis no longer appropriate under Akron. When regulations affecting first trimester abortions are involved, "[c]ertain regulations that have no significant impact on the woman's exercise of her right may be permissible where justified by important state health objectives." Akron, 103 S.Ct. at 2492-93. We must then consider whether these regulations have any significant impact on a woman's ability to choose to terminate her first trimester pregnancy.
 
 
 75
 At trial plaintiffs introduced estimates of the cost of complying with the staffing, equipment and structural regulations. The cost of correcting just the structural violations of the plaintiff clinics ranged from $139,412 to $438,250, according to the plaintiffs' expert witness (Pickens, 5/28/80, Tr. at 41, 48, 55, 59). There was undisputed evidence that abortion clinics already licensed as FSOFs had spent from $10,000 (renovation) to $680,000 (cost of new building) to bring their facilities into compliance with these regulations. Even after large expenditures, most of these licensed facilities did not fully comply with the FSOF regulations (10/22/80, Tr. 23-59). The State's expert agreed the plaintiff clinics would have to undergo structural changes in order to be approved under the regulations; and despite its insistence that plaintiffs' estimates of the cost of compliance were excessive, the State offered no estimates of its own (Drake, 6/26/80, Tr. 78-79, 81-82).
 
 
 76
 The trial court made no findings of fact concerning the costs of compliance and did not determine whether the cost of compliance with the regulations would result in a substantial increase in the cost of abortions. Despite this lack of factual findings, the evidence clearly reveals compliance would involve substantial structural alterations of the plaintiff clinics. For example, in existing FSOFs each procedure room is required to provide a minimum of 120 square feet of usable floor space, while examining rooms must provide a minimum of 70 square feet of usable floor space. R. 325.3866 (Rule 66). In newly constructed or renovated FSOFs, these minimum space requirements are increased to 150 square feet and 80 square feet respectively. Id. Even without a protracted analysis of the staffing, structural and equipment regulations, it appears unquestionable that by requiring expensive alterations these regulations will greatly increase the cost of abortions and thus have a significant impact on a woman's exercise of her right to a first trimester abortion.
 
 
 77
 Although the precise amount of the increased cost here is unknown, a look at the Supreme Court's analysis of what constitutes a significant cost increase is instructive. In Planned Parenthood v. Ashcroft, supra, the Supreme Court held valid a state regulation requiring that a pathologist examine all tissue removed surgically including tissue removed in the course of an abortion. Ashcroft, 103 S.Ct. at 2524. Compliance with the regulation was estimated to increase the cost of each abortion by $19.40, id. 103 S.Ct. at 2524, to $40.00, id. 103 S.Ct. at 2528, an increase a majority of the Court felt did "not significantly burden a pregnant woman's abortion decision," id. 103 S.Ct. at 2524. When this increased cost was compared with the substantial benefit that might result from a pathologist's examination, five members of the Court concluded the "small" increase in cost was justified. Id. 103 S.Ct. at 2524. In contrast, four justices dissented from this conclusion and found that although a $40.00 "increase may seem insignificant from the Court's comfortable perspective, [the dissenters] cannot say that it is equally insignificant to every woman seeking an abortion." Id. 103 S.Ct. at 2528 (Blackmun, J., concurring in part and dissenting in part).
 
 
 78
 By comparison, compliance with these Michigan regulations would involve far greater expenditures than those involved in Ashcroft. In the instant case, there was evidence that compliance with the FSOF regulations would increase the weekly operating expenses of one plaintiff clinic by 156% and of another by 54% (Chelian, 6/20/80, Tr. 78, 80). Moreover, these figures do not include any price increases that might be necessitated by complying with the structural regulations. The State offered evidence that some abortion clinics already licensed as FSOFs did not charge substantially more for abortions than did the plaintiff clinics. Most of these licensed clinics, however, had not fully complied with the regulations being challenged by the plaintiffs.
 
 
 79
 In light of this clear evidence of the significant impact which these staffing, structural and equipment regulations would have on a woman's access to abortion, we hold them to be an unconstitutional infringement on her right to privacy. In so doing, we are mindful of the State's interest in assuring "that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." Roe v. Wade, 410 U.S. at 150, 93 S.Ct. at 725. We also note, however, that first trimester abortions are relatively safe and have a mortality rate "as low or lower than the rates for normal childbirth." Roe v. Wade, 410 U.S. at 149, 93 S.Ct. at 725 (footnote omitted); Connecticut v. Menillo, 423 U.S. at 11, 96 S.Ct. at 171. Abortion, at least during the first trimester, is generally considered a minor surgical procedure. See Akron, 103 S.Ct. at 2500 and n. 35. In view of the significant impact which these staffing, structural and equipment regulations have on a woman's right to terminate her first trimester pregnancy, we hold these rules unconstitutional.
 
 
 80
 (e) Rule 38: Review of medical records by outside physician
 
 
 81
 Rule 38 requires that FSOFs arrange for impartial medical surveillance and a review of the quality of care provided by their facility at regular and periodic intervals. R. 325.3838 (Rule 38). The medical review requirements of Rule 38 apparently would require that each FSOF engage a physician not a member of its staff to visit the FSOF at least quarterly to "review those charts that have recorded complications and a few other unspecified number, selected at random, and merely give a written report to the facility indicating any suggestions or comments that [the reviewing physician] might have relative to possible ways of improving the quality of medical care." 508 F.Supp. at 1377. Plaintiffs object that such a medical review process is expensive and would lead to higher costs for abortions, and there was evidence that a reviewing physician might charge $200.00 per hour to review an FSOF's records (Acosta, 5/29/80, Tr. 167). The trial court made no factual findings concerning the cost of medical review but concluded Rule 38 did not "in any way burden a woman's right to seek an abortion." 508 F.Supp. at 1378. The trial court then sustained the medical review regulation as "rationally related to the State's legitimate interest in assuring compliance with health regulations." Id.
 
 
 82
 Faced with undisputed testimony that Rule 38 would involve some increased expenditure by the plaintiff clinics, we cannot ignore the possibility that the medical review regulation might have more than an insignificant impact on a woman's exercise of her fundamental right. The district court's opinion, however, does not contain facts that would enable us to determine the significance of the impact, if any, of Rule 38 on a woman's right to abortion. When an appellate court discerns that additional fact findings are necessary, the usual rule is to remand for further proceedings to permit the trial court to make the necessary findings. Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). Therefore, we remand this aspect of the case to the district court for additional fact-finding to allow that court to determine whether the medical review process required by Rule 38 is a minor regulation having no significant impact on the plaintiffs' patients' access to abortion. If, on remand, the trial court finds this regulation has no significant impact on a woman's fundamental right to abortion, then that court must further determine whether the State has established that the regulation is rationally related to an important State interest in health. The Supreme Court's recent decisions offer new guidance to the district court in this matter.
 
 
 83
 (f) Rule 68(8): FSOF corridors must be six feet wide
 
 
 84
 Rule 68(8) requires that all FSOF "corridors used for patient entry, egress and for surgical care areas" be at least six feet wide. The trial court found Rule 68(8) "is not reasonably related to the State's interest in assuring adequate health care for its citizens." 508 F.Supp. at 1384. In accordance with our reasoning in section IV(B)(1)(d) above, we affirm the trial court's holding.
 
 
 85
 2. Legislation affecting second trimester abortions
 
 
 86
 (a) Rule 51: No post first trimester abortions may be performed in Freestanding Outpatient Surgical Facilities
 
 
 87
 Rule 51 requires that if a FSOF performs abortions there must be a written policy governing the abortion procedures performed there. Included in the policy must be a provision requiring that "only uncomplicated pregnancies of not over 14 weeks duration may be performed in a facility unattached to or physically remote from a parent hospital." R. 325.3851 (Rule 51). In effect, Michigan's Rule 51 requires that all second trimester abortions be performed in a facility owned and operated by a "parent hospital." By statutory definition, freestanding surgical outpatient facilities do not include surgical facilities owned and operated by a hospital. Sec. 20104(5). Thus, the effect of Rule 51 is to prohibit any abortion clinic, whether or not it is licensed as a FSOF, from performing second trimester abortions unless the clinic is owned and operated by its parent hospital and is attached to or not remote from that hospital.
 
 
 88
 Rule 51 primarily bears on second trimester abortions, and, as reviewed above, the Supreme Court held in Roe v. Wade that during the second trimester the State has a compelling interest in maternal health that justifies the reasonable regulation of second trimester abortions. But, because of the Supreme Court's recent decision in Akron, this analysis now involves an intermediate step. Now, in order to ascertain the reasonableness of second trimester regulation, it must be determined whether the regulation "depart[s] from accepted medical practice." Akron, 103 S.Ct. at 2493.
 
 
 89
 In Akron the Supreme Court struck down a city ordinance requiring that after the first trimester an abortion had to be performed in an acute care, full-service hospital. Id. 103 S.Ct. at 2497. The Supreme Court agreed that during the second trimester a State has a compelling interest in maternal health, but the Court reiterated that the existence of this compelling State interest in health is only the first step of the analysis. Before a restrictive regulation can be upheld, the State must also demonstrate that the regulation is reasonably designed to further this State interest.
 
 
 90
 In that case, the city of Akron did argue that the in-hospital requirement was reasonably related to the State's interest in maternal health. However, this was countered by evidence of recent medical developments that show a dramatic increase in the safety of abortions performed early in the second trimester. This "present medical knowledge" negated Akron's contention that the in-hospital requirement reasonably furthered the State's interest in maternal health. Id. 103 S.Ct. at 2496. Based on the increased safety of second trimester abortions, the Supreme Court concluded that the in-hospital requirement for all post first trimester abortions "depart[ed] from accepted medical practice." Id. 103 S.Ct. at 2493. Although it recognized that a State must necessarily "have latitude in adopting regulations of general applicability in this sensitive area [of second trimester abortions]," the Supreme Court nevertheless invalidated the regulation and warned that "if it appears that during a substantial portion of the second trimester the State's regulation 'depart[s] from accepted medical practice,' [then] the regulation may not be upheld simply because it may be reasonable for the remaining portion of the trimester." Id. 103 S.Ct. at 2495 (citation omitted).
 
 
 91
 In light of the Supreme Court's holding in Akron it appears we must reverse the trial court and find invalid Michigan's requirement "that only uncomplicated pregnancies of not over 14 weeks duration may be performed in a facility unattached to or physically remote from a parent hospital." It is true that, unlike the legislation in Akron and Ashcroft, the Michigan statute does not require all second trimester abortions be performed in an acute care, general service hospital. The wording of Rule 51, however, leads one to conclude that only facilities owned and operated by a hospital may perform second trimester abortions, since only these facilities would have a "parent hospital." Also, to perform a second trimester abortion, such a hospital-owned facility would have to be adjacent to (or at least not physically remote from) the parent hospital. Assuming the existence of a compelling state interest in maternal health that justifies Michigan's regulation of second trimester abortions, Michigan has not advanced any reasonable justification for Rule 51's distinguishing FSOFs from outpatient facilities owned and operated by a parent hospital and not physically remote from that parent hospital. Indeed, Rule 51 ignores the "impressive evidence that--at least during the early weeks of the second trimester--D & E [dilatation-and-evacuation] abortions may be performed as safely in an outpatient clinic as in a full-service hospital." Id. 103 S.Ct. at 2496 (footnote omitted).
 
 
 92
 Because it fails to reasonably limit its effect to "the period in the [second] trimester during which [the state's] health interest will be furthered," id. 103 S.Ct. at 2495, we conclude Rule 51's requirement that only pregnancies of less than fourteen weeks duration may be performed in a FSOF is invalid.
 
 V. Conclusion
 To restate the Court's ruling:
 
 93
 We affirm the trial court's holding that the State of Michigan has not violated the plaintiffs' equal protection rights by regulating freestanding surgical outpatient facilities where abortions are performed while not regulating physicians' private offices where abortions are performed.
 
 
 94
 We affirm the trial court's holding that plaintiffs failed to establish such selective enforcement of the FSOF licensing scheme as would amount to a violation of the plaintiffs' equal protection rights.
 
 
 95
 We affirm the trial court in holding that Rule 33 (counseling and referrals), Rule 47 (medical records), and Rule 35 (physician qualifications) do not violate the constitutional rights of plaintiffs or their patients.
 
 
 96
 We affirm the trial court's holding that Rule 68(8) (six foot corridors) is not reasonably related to a legitimate State interest.
 
 
 97
 We vacate the trial court's determination that the staffing, structural and equipment regulations do not unduly burden a woman's right to abortion. Rather, we find that Rules 26(2), 35(3), 57(6), 66, 67 and 68 have a significant impact on a woman's right to terminate her first trimester pregnancy, and, therefore, hold these regulations unconstitutional.
 
 
 98
 We vacate the trial court's determination that Rule 38 (review of medical records) does not unduly burden a woman's right to abortion. This regulation is remanded for further fact-finding and consideration in accordance with this opinion.
 
 
 99
 Finally, we vacate the trial court's finding with respect to Rule 51 (regulation of second trimester abortions) and hold that Rule 51 is an unconstitutional violation of a woman's due process right to terminate her pregnancy free of State interference.
 
 
 100
 Accordingly, the judgment of the District Court is affirmed in part and vacated in part, and the case is hereby remanded to the District Court for further proceedings consistent with this opinion.
 
 
 101
 MERRITT, Circuit Judge, concurring in part and dissenting in part.
 
 
 102
 The Michigan first trimester abortion regulations subject to review here were promulgated by the Michigan Department of Health. They are lengthy regulations. They consist of over 200 paragraphs. The following listing will give the reader a sense of the type of requirements they impose on first trimester abortion clinics:
 
 
 103
 The regulations govern who may apply for a license for a first trimester abortion clinic, MICH.ADMIN.CODE R. 325.3811(3) (1976); the kind of forms necessary, id. R. 325.3811(2); the need for a written "disaster plan" in order to operate the clinic, id. R. 325.3822; the need for a "qualified physician" to be "present on the premises of a facility through the post operative period, id. R. 325.3825(2); the need for written rather than verbal orders from doctor to nurse in connection with operations and other medical matters, id. R. 325.3825(3); the need for pre-existing arrangements for emergency hospital services and the purchase of emergency transportation equipment or service, id. R. 325.3832; the need for comprehensive counseling services, id. R. 325.3833; "hot and cold beverages ... served in an appealing manner," id. R. 325.3844; a "housekeeping manual" which includes procedures to be followed in connection with cleaning and maintenance, id. R. 325.3844; the need for X-ray and radiological services "with necessary staff within the facility," id. R. 325.3846; an elevator to the second floor, id. R. 325.3858; a locker room for employees, id. R. 325.3859(4); examination rooms with a minimum of 70 square feet together with "a hand wash lavatory within the room, equipped with a goose neck inlet and wrist, knee or foot controls," id. R. 325.3866(1) & (9); operating rooms with a minimum of 120 square feet, id. R. 325.3866(4); "a supply of oxygen with oxygen masks," id. R. 325.3866(6); a system of electronic nurse call signals, id. R. 325.3866(8); "single use soap," id. R. 325.3866(10); "a janitor's closet with service sink," id. R. 327.3867(6); "comfortable furnished congregate rooms equipped with either reclining or lounge type chairs," id. R. 325.3868(6); six foot corridors, id. R. 325.3868(8); rooms to be maintained at a temperature of at least 70 degrees fahrenheit with a maximum temperature of 78 degrees fahrenheit as measured three feet above floor level," id. R. 325.3871(2); "minimum water pressure available to each plumbing fixture shall exceed 20 pounds per square inch," id. R. 325.3871(4); "hot water temperature" between the "range of 110 to 125 degrees fahrenheit," id. R. 325.3872(6); "a central storage room," id. R. 325.3877(2), etc.
 
 
 104
 In my view these regulations are oppressive as a whole. The regulations run up costs to the consumer of first trimester abortion services without any compelling state interest. They, therefore, undermine the effective enjoyment of a woman's right to an abortion in clear violation of our decision in Mahoning Women's Center v. Hunter, 610 F.2d 456 (6th Cir.1979), vacated on other grounds, 447 U.S. 918, 100 S.Ct. 3006, 65 L.Ed.2d 1110 (1980), and the Supreme Court's recent holding in City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 476, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983). In Akron, the Court reaffirmed and added a gloss to Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), holding that the right of privacy encompassing a woman's decision to terminate her pregnancy may be affected only by regulations which are "justified by important state health objectives" and "have no significant impact" on the exercise of this right. 103 S.Ct. at 2492-93. Akron clearly prohibits state laws which significantly increase first trimester abortion costs without compelling justification. See also Planned Parenthood Association v. Ashcroft, --- U.S. ----, 103 S.Ct. 2517, 2524, 76 L.Ed.2d 733 (1983) (quoting Akron and applying "no significant impact" test to requirement of pathology report). The Michigan regulations governing first trimester abortions are more numerous and oppressive and no more sensible than the similar regulations struck down by this Court in Mahoning. The legislative history of the Michigan regulations shows that they were pointed at and designed to govern first trimester abortion clinics, just as in Mahoning, where the regulations were "designed to leave in place in an abstract sense the woman's autonomy and choice, her abstract 'right' to get an abortion during the first trimester, but ... remove[d] the effective enjoyment of that right by imposing heavy and unnecessary conditions on the performance of the operation." Mahoning, 610 F.2d at 460.
 
 
 105
 In my judgment we should not temporize on this issue by remanding the case back for further proceedings in the District Court, proceedings that can lead to only one reasonable conclusion. The case has been in court for seven years. It has already been remanded to the District Court once. The regulations were adopted in Michigan as a comprehensive system governing first trimester abortions. They cannot reasonably be split up or severed. They have been drafted broadly to cover all "freestanding surgical outpatient facilities," and thus have an impact on toe operations as well as abortions, nevertheless, the state cannot burden a woman's constitutional right, or its effective enjoyment, under the guise of a broad regulation governing clinics generally any more than it can do so by a specific statute aimed solely at abortion clinics. Both have the same effect, and both are unconstitutional.
 
 
 106
 I would therefore hold the set of regulations as a whole unconstitutional as applied to clinics which perform first trimester abortions. Because the regulations are unconstitutional, as applied to places conducting first trimester abortions, whether they are applied only to "freestanding surgical out-patient facilities" or to physicians' offices as well, I find it unnecessary to reach plaintiffs' argument that the regulations violate the equal protection clause of the fourteenth amendment.
 
 
 
 *
 The Honorable Odell Horton, Judge of the United States District Court for the Western District of Tennessee, sitting by designation
 
 
 [1]
 This Court decided, before ruling in this case, to await the Supreme Court's decisions in City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); Planned Parenthood Assn. v. Ashcroft, 462 U.S. 476 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983); and Simopoulos v. Virginia, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983). These decisions are now available and this Court proceeds to rule on this appeal from the decision of the United States District Court for the Eastern District of Michigan, Birth Control Centers, Inc. v. Reizen, 508 F.Supp. 1366 (E.D.Mich.1981). These Supreme Court decisions were not available to the district court at the time of his decision in this case
 
 
 [2]
 The trial court invalidated two regulations: Rule 32, which requires FSOFs to have a written agreement with a nearby licensed hospital to provide emergency admission of postsurgical patients, and Rule 68(8), which requires that corridors used by patients have a minimum width of six feet. 508 F.Supp. at 1374-75 and 1384-85. The State appealed the trial court's invalidation of Rule 68(8)'s requirement for six foot corridors but did not appeal the invalidation of Rule 32
 
 
 [3]
 As the classification is based neither on race nor on gender, the plaintiffs' attempt to apply the reasoning of the Supreme Court in Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), is not appropriate. Furthermore, Feeney requires proof of discriminatory intent. Id. at 274, 99 S.Ct. at 2293. Here the trial court found no such discriminatory intent. 508 F.Supp. at 1387-89. Plaintiffs have not demonstrated this finding to be erroneous
 
 
 [4]
 This is not a situation such as that in Mahoning Women's Center v. Hunter, 610 F.2d 456 (6th Cir.1979), vacated on other grounds, 447 U.S. 918, 100 S.Ct. 3006, 65 L.Ed.2d 1110 (1980), where the challenged city ordinance imposed a series of costly medical and building code requirements on first trimester abortion clinics while leaving unregulated the performance of other medical and surgical procedures. In Mahoning this Court upheld the district court's ruling that the challenged ordinance deprived physicians who performed first trimester abortions of equal protection of the law. Mahoning Women's Center v. Hunter, 610 F.2d 456 (6th Cir.1979), aff'g. 444 F.Supp. 12 (N.D.Ohio 1977), vacated on other grounds, 447 U.S. 918, 100 S.Ct. 3006, 65 L.Ed.2d 1110 (1980)
 
 
 [5]
 Evidence at trial showed that during the first quarter of 1980 approximately 12,000 abortions were performed in the State of Michigan. Fifty-seven percent of these abortions were performed in FSOFs, nineteen percent in physicians' offices and eighteen percent in hospitals (Yerian, 6/20/80, Tr. 43-44)