**ALLEGHENY AIRLINES, INC.,**
Appellant,

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION et al.**

No. 71–1057.

United States Court of Appeals,
Third Circuit.

Argued Jan. 4, 1972.

Decided July 21, 1972.

Robert H. Young, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellant.

Daniel F. Joella, Harrisburg, Pa., for appellee.

Before HASTIE and MAX ROSENN, Circuit Judges, and McCUNE, District Judge.

## OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

Allegheny Airlines, Inc. (Allegheny) brought suit in the United States District Court for the Eastern District of Pennsylvania seeking a declaratory judgment holding that certain of the Pennsylvania Public Utility Commission's (PUC) orders and rules, pertaining to air service between Pennsylvania cities, constituted an unlawful intrusion upon an area occupied exclusively by federal legislation. Allegheny also sought to perpetually enjoin the PUC from further actions against it.[1] The district court decided that the case presented a situation in which it was compelled to abstain. It therefore dismissed the complaint. Allegheny Airlines, Inc. v. Pennsylvania Pub. Util. Comm., 319 F.Supp. 407 (E.D. Pa.1970). From this decision, Allegheny appeals.

## I. BACKGROUND

Allegheny received from the PUC an intrastate freight certificate in 1940,

and a passenger certificate in 1949. Until 1963, one of the services provided by Allegheny, and for which it was and is certificated by the PUC, was nonstop service between Williamsport and Harrisburg, a distance of some 71 miles.

The flight between Harrisburg and Williamsport was part of a longer flight route designated by the PUC "intrastate route No. 5." It appears that intrastate route No. 5 was a segment of a still larger route, certified by the Civil Aeronautics Board (CAB), which is interstate in nature. That is to say, planes coming from outside of Pennsylvania fly through the state, landing along the route designated intrastate route No. 5.

In 1963, Allegheny unilaterally discontinued the segment of intrastate route No. 5 which directly connected Williamsport and Harrisburg. Allegheny did not entirely eliminate either Harrisburg or Williamsport from all Allegheny plane service. It was still possible to travel by air on Allegheny airplanes between Williamsport and Harrisburg, although such a journey might require flying to numerous distant points, on a variety of planes, before eventually reaching the desired destination.

After Allegheny discontinued the Williamsport-Harrisburg segment of route No. 5, the PUC and Allegheny entered into negotiations. In the meantime, Allegheny discontinued furnishing single plane direct service between at least six other pairs of points within Pennsylvania. All these discontinuances were on intrastate routes authorized and certificated by the PUC. Subsequently, the negotiations between the airline and the PUC broke down.

The PUC then took official agency action to compel Allegheny—*not to furnish the discontinued plane service*—but to apply to the PUC, in the manner prescribed by the applicable Pennsylvania law and the regulations of the PUC, whenever it wished to discontinue single plane direct service between intra-

---

1. The Air Transport Association, National Association of Regulatory Utility Commissioners, and Civil Aeronautics Board have joined this case as Amicus Curiae.

Pennsylvania points on routes authorized by the PUC. In the alternative, the PUC sought restoration of the deleted air service.

On June 10, 1968, the PUC issued a "Rule to Show Cause," which noted that Allegheny had abandoned the air service between Harrisburg and Williamsport without seeking approval of the Commission. The rule directed Allegheny to show cause why its certificate of public convenience should not be canceled, and other appropriate penalties imposed, for its discontinuance of service.

Allegheny answered this rule by arguing that under federal law and the CAB regulations and practice, it was permitted to make such changes at will. Further, it contended that "both as a practical matter and a matter of law, its Pennsylvania certificate of public convenience should be interpreted in a manner which is consistent with its federal certificate." It is clear that the thrust of the airline's answer was that federal law and practice had preempted the state regulation asserted by the PUC. A hearing on the Commission's rule was held on September 19, 1968. At this hearing, Allegheny offered no testimony or other evidence concerning the need to discontinue the service in question. Again, it was clear that the thrust of the airline's position was that federal law had preempted the asserted state action.

On June 23, 1969, the PUC entered an order making absolute its rule of June 10, 1968, and directed Allegheny to pay a penalty of $5,000 for its failure *to seek approval* of its abandonment of service between Harrisburg and Williamsport. The PUC also directed Allegheny to reinstitute the service within thirty days or, in lieu thereof, file with the PUC *nunc pro tunc* an appropriate petition or application seeking approval for the abandonment of service.

The June 23rd order was accompanied by an extensive written opinion, which defined the PUC's concerns, and which laid clear the legal foundation for their decision. The Pennsylvania au-thority for controlling the deletion of direct air service between Harrisburg and Williamsport was 66 P.S. § 1122:

> Upon the application of any public utility and the approval of such application by the commission, evidenced by its certificate of public convenience first had and obtained, and upon compliance with existing laws, *and not otherwise*, it shall be lawful:
>
> \*   \*   \*   \*   \*   \*
>
> (b) For any public utility *to abandon or surrender, in whole or in part,* any service. . . .

And 66 P.S. § 1171:

> —Every public utility shall furnish and maintain adequate . . . reasonable service. . . . *Such service also shall be reasonably continuous and without unreasonable interruptions or delay.*

(Emphasis supplied.)

The PUC also called attention to its own rule 8(b):

> (b) *Abandonment of Service*—Unless upon termination of certificate or order of the Commission, no common carrier shall abandon, in whole or in part, any operation *without first making application to the Commission for permission to do so.* . . .

(Emphasis supplied.)

The PUC felt that Allegheny's discontinuance of service between Williamsport and Harrisburg clearly came within these laws and regulations because:

> . . . even if facts had been established to indicate that air service between Harrisburg and Williamsport is available via Pittsburgh and or Scranton, this would not establish substantial compliance with respondent's obligation. *To reach a point 71 miles distant by use of several planes, several transfers and the traveling of several hundred miles during a period of several hours is not adequate air service by any standard.*

(Emphasis supplied.)

However, the PUC made clear that it was making no finding as to whether or

not Allegheny, after a full and fair hearing, at which evidence was presented, should or should not be able to discontinue the service:

> . . . *we are not* attempting to determine whether or not respondent upon proper application . . . should be allowed to abandon the segment. . . . We do *not* expressly or impliedly, suggest that we may . . . require respondent to render unnecessary, unpatronized, unprofitable service. . . .

(Emphasis in text.)

Two primary considerations were defined as the principal motivations for the agency's action. First, the agency advanced what was essentially an equitable argument: Allegheny itself had approached the Commission, requested certification to fly the delineated intrastate route. In receiving this state benefit, it had accepted a corresponding duty to abide by the state regulations. The Commission thus sought to distinguish this case from one in which an airline had never sought state certification and the state agency was itself trying to bring the airline under its regulation:

> While . . . *prior to its Pennsylvania certifications for its intrastate services,* [Allegheny] *was under no obligation* to render intrastate service, *once it sought,* and was granted, and accepted *state certification* to render intrastate service between specific points within the Commonwealth of Pennsylvania, *it accepted the corresponding obligation* to do so under the laws of this state and the Rules and Regulations of this Commission.

(Emphasis supplied.)

The second consideration, interrelated with the first, was the practical effect Allegheny's refusal to come before the Commission, with evidence, might have on the regulatory structure of the PUC. The Commission was obviously concerned because Allegheny, since it first sought state certification in 1940, has become entwined within the state framework for regulating the state's various transportation facilities. As the PUC noted:

> The *thrust of these proceedings* is that existing certificated service *has been found, after application by the carrier* and after opportunity to affected parties to be heard, to be *necessary to the public interest.*

(Emphasis supplied.)

The initial state proceeding—that which found that the service which Allegheny sought to provide was in the public interest—might have affected numerous other facets of the state transportation system, aside from its obvious potential effect upon the plans and patterns of service of other airlines. Certification of public transportation, under the terms of the state act, can only be had if in the public interest. The fact that Allegheny had sought and been granted the route between Harrisburg and Williamsport might have deterred other service between these cities from developing. For example, bus service might have been decreased as a result of the air service which Allegheny offered to, and did, supply. Moreover, a decision to abandon the air service might mean that the state would need to develop alternative services between these two cities. In any event, the concern of the PUC was that these problems could only be resolved, highlighted and defined through the normal regulatory structure, which provided for public hearings and the presentation of evidence concerning the specific service in question. Unilateral action on the part of public utilities—in total disregard of any procedural requirements—could produce confusion and disruption throughout the state.

Allegheny did not comply with the order of the PUC, nor challenge it before any state court. The airline, however, instituted suit in the district court for the Eastern District of Pennsylvania requesting a declaratory judgment against the PUC and a permanent injunction restraining the PUC from any further action. The district court, on cross motions for summary judgment dismissed the suit. The district court did not

reach the merits, but predicated its decision on the abstention doctrine.

## II. JURISDICTION

Allegheny pleaded jurisdiction both in terms of diversity, and 28 U.S.C. § 1331 (a), which gives jurisdiction over matters arising under the "Constitution, laws, or treaties of the United States." The district court did not believe that jurisdiction could properly be based on § 1331 because:

> [i]n suits in the federal courts arising out of proceedings pending or threatened in state tribunals, the federal court's jurisdiction may not be predicated upon federal question defenses to the state proceedings.  .  .
> It is only if the state *complaint* raises federal questions that the federal court's jurisdiction may be based on federal question grounds.

(emphasis in text;  citations omitted) Allegheny Airlines Inc. v. Pennsylvania PUC, supra., 319 F.Supp. at 411.

The district court concluded, however, that jurisdiction was properly grounded in diversity, since Allegheny was a Delaware Corporation with its principal place of business in the District of Columbia, the PUC was an agency of the Commonwealth of Pennsylvania, and finally, because the amount in controversy exceeded $10,000.

■ ■ Although neither party has raised the jurisdiction issues in this appeal, "it is the duty of this court to see to it that the jurisdiction of the circuit court, which is defined and limited by statute, is not exceeded." Mansfield, C. & L. M. R. Co. v. Swan, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462. We believe that the district court correctly determined that § 1331 jurisdiction was lacking, even though the issue may not be completely laid to rest. *See* Wright, Law of Federal Courts, (1970), at 62.

As the district court noted, "[a]lthough Allegheny's complaint is not, in terms, brought under the Declaratory Judgment Act, 28 U.S.C. § 2201, the first portion of its prayer for relief is declaratory in nature." Allegheny Airlines, Inc. v. Pennsylvania PUC, supra, 319 F.Supp. at 412. Public Service Comm. v. Wycoff Co., 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952) strongly supports the conclusion that suits of this kind, which request declaratory and injunctive relief, and raise the federal issue only as a defense in the state forum, will not support jurisdiction:

> Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, *it is the character of the threatened action, and not the defense*, which will determine whether there is federal-question jurisdiction in the District Court.
>
> *Id.,* at 248, 73 S.Ct. at 242 (emphasis supplied.)

Moreover, this conclusion is in line with the holding expressed in the landmark case of Louisville and Nashville Ry. Co. v. Mottley, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908).

■ We, also, believe the district court was correct in holding that the plaintiff had made out a case for diversity of citizenship jurisdiction. The PUC has made no challenge to diversity jurisdiction or the potential damage which Allegheny alleges.[2] The requirements of diversity appear to be met. Pennsylvania R. Co. v. City of Girard, 210 F.2d 437 (6th Cir. 1965).

## III. EQUITABLE INTERVENTION

Although jurisdiction exists, a federal court:

> .  .  . may, in its sound discretion, whether its jurisdiction is invoked *on the ground of diversity of citizenship* or otherwise, 'refuse to enforce or pro-

---

2. Allegheny's major place of business is Washington, D.C. while the PUC is a Pennsylvania regulatory agency. Allegheny has made the unchallenged allegation that it will suffer damages, as a result of the June 23 order, in excess of $10,000.

tect legal rights, the exercise of which may be prejudicial to the public interest.'

(citations omitted; emphasis supplied) Burford v. Sun Oil Co., 319 U.S. 315, 317–318, 63 S.Ct. 1098, 1099, 87 L.Ed. 1424 (1943).

■■■ The district court believed that this was such a case and therefore abstained. It held that "where a private party seeks either declaratory or injunctive relief against a state administrative agency, federal courts ordinarily should abstain from exercising their powers in the interest of federal-state comity." Allegheny Airlines, Inc. v. Pennsylvania PUC, supra, 319 F.Supp. at 412. The court concluded that "where an order of the state agency predominately affects local matters, if there is available to the aggrieved party adequate state judicial review, the federal courts should refuse to exercise their equity powers to restrain enforcement of the administrative order, thus avoiding unnecessary federal-state conflict." Id., at 413. It noted that in the instant case "the dispute between the PUC and Allegheny predominately affects local matters, i. e., intrastate air service and the scope of authority and procedures of the state administrative agency. Id. We agree.[3]

The district court's holding was grounded on Alabama Public Service Comm. v. Southern Ry. Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). There a railroad company applied to the Alabama Public Service Commission for permission to eliminate certain local passenger service. The Commission refused to allow discontinuance, citing local needs. The company, rather than taking an appeal through the state court system as provided for under state law, filed a complaint in federal district court seeking injunctive relief. Jurisdiction was grounded on diversity of citizenship and the presence of a federal question. A three judge court entered judgment holding the Commission order void and enjoining the Commission from enforcing its order or any penalty provisions of the applicable law.

On appeal the Supreme Court reversed. The crux of its holding was that:

Equitable relief may be granted only when the District Court, *in its sound discretion* exercised with the '*scrupulous regard for the rightful independence of state governments* which should at all times actuate the federal courts,' is convinced that the asserted federal rights cannot be preserved except by granting the 'extraordinary relief of an injunction in the federal courts.' Considering that '[f]ew public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of *needless friction* with state policies,' the usual rule of comity must govern the exercise of equitable jurisdiction by the District Court in this case.

(emphasis supplied; citations omitted) Id., at 349–350, 71 S.Ct. at 768.

The same critical factors of *Southern Ry.*—that the case involved significant state concerns, and an early entry of a federal court into the area might promote needless friction between state and federal jurisdiction—have formed the basis for absention in numerous other cases. See, e. g., Burford v. Sun Oil Co., supra, 319 U.S. at 332, 63 S.Ct. 1098; Great Lakes Dredge & Dock Co. v. Hufflman, 319 U.S. 293, 298, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943); Railroad Commission v. Rowan & Nichols Oil Co., 310 U.S.

3. In what was basically an alternative abstention holding, the district court noted that "the dispute involves an unsettled question of state law, i. e., the extent of the PUC's authority to regulate intrastate air rights granted to an interstate air carrier." Allegheny Airlines Inc. v. Pennsylvania PUC, 319 F.Supp. 407, 413 (E.D.Pa.1970). Since we find that the district court was correct in abstaining for the primary reasons it developed, we find it unnecessary to decide whether it correctly concluded there existed unclear state law. We note, however, that in our view, the PUC's authority to take the measures described above seems clear. 66 P.S. § 1122.

573, 580, 60 S.Ct. 1021, 84 L.Ed. 1368 (1940); Pennsylvania v. Williams, 294 U.S. 176, 185, 55 S.Ct. 380, 79 L.Ed. 841 (1935).

As commentators construing the *Alabama* decision have noted, " . . . the Court must be considered to have ordered abstention *solely* for the purpose of avoiding federal-state friction," Abstention, 59 Col.L.Rev. 749, 759 (1958) (emphasis supplied). Whether or not the exercise of equitable abstention will, in a particular case, create federal-state friction, is a question for which there is no one simple test. Thus, equitable abstention has not produced clearly defined rules, as has the traditional and more common ground for abstention enunciated in Railroad Comm. of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).[4] However, the primary concern running through the cases in which the Court has abstained for equitable principles seems to be the possibility of friction caused by interference with the orderly procedures and rules of state *regulatory bodies*. *See, e. g., Alabama,* supra, *Burford,* supra. The instant case presents just such a threat: a serious possibility of disturbing the orderly state system of agency regulation of transportation within Pennsylvania.

Allegheny has contended here that it was not required to comply with the procedural regulations of the Commission for discontinuance of service because it was also an interstate air carrier. The Commission, on the other hand, has argued that once a carrier seeks and accepts state certification to render an intrastate service, it accepts the corresponding obligation to settle disputes as provided under state law and the rules and regulations of the Commission. Its primary position is that a certificated carrier may not discontinue the service without making an application to do so under Commission regulations and thereby giving affected parties an opportunity to be heard.

Stripped of the efforts to drape this case with federal questions, the facts show that Allegheny, without any attempt on the part of the PUC to extend its regulatory powers over it, made a written application to the PUC for a certificate of public convenience as an *intrastate* carrier to transport passengers between certain cities in Pennsylvania, including Harrisburg and Williamsport. The service it offered to provide was found by that Commission, after a hearing and an opportunity for affected parties to be heard, to be necessary to the public interest. A certificate of public convenience was granted and it is now held by Allegheny. Under the rules of the Commission, all or part of this service may be discontinued upon application by the carrier to the PUC and that agency's approval. Additionally, matters such as this which go to the jurisdiction of the PUC may be tested in special proceedings before the Pennsylvania Commonwealth court. 66 P.S. § 1441. The thrust of these Pennsylvania rules and laws is that, once certified, a carrier must test these issues before service is discontinued.

The issue, thus, is not, at this stage, whether the airline may or may not discontinue the service in question because federal legislation has preempted the field. The issue is whether a state certificated public utility may arbitrarily ignore the procedural rules of the Commission which require that issues, including jurisdictional issues, be raised before discontinuance of service. We note that Allegheny might have sought federal declaratory relief before discontinuing the air service.[5] In the alterna-

---

4. See, generally, Bednar, Abstention Under Delaney: A Current Appraisal, 49 Texas L.Rev. 247 (1971); Abstention and Certification in Diversity Suits, 73 Yale L.J. 85 (1964); Consequences of Federal Abstention, 73 Harv.L.Rev. (1960).

5. This might, perhaps, have been action substantially equivalent to bringing the preemption issue before the Commission or before the Commonwealth Court under 66 P.S. § 1441.

tive, of course, Allegheny might have sought state consideration of its federal preemption argument before discontinuing the air service. It did neither: with no prior warning, and in total disregard of the state policy, it abruptly terminated the state certificated flight. If Allegheny can discontinue state certificated service with no notice and then forestall state action by proceeding to the federal courts, other state certificated carriers may attempt similar action. The carefully regulated state transportation system could be thrown into chaos. For this court to reach the merits of Allegheny's contentions would be to ignore the state regulatory body in the same manner the airline has. This is precisely the kind of action that the Supreme Court has counseled against. *See, e. g., Alabama, supra.*

There are several additional factors, perhaps unique to this case, which also dictate our conclusion that the district court correctly exercised its discretion. First, we note that the state concerns, in terms of the subject matter in question here, are significant. Commercial carriers can operate only if airports, runways, and related facilities are provided. These often require large expenditures, particularly in densely populated areas, frequently at considerable community sacrifice and effort. The communities involved here may have come to depend on the direct air service which Allegheny has supplied in the past. If this be true, the arbitrary discontinuance of direct air service without notice, an opportunity

to be heard, or time in which to secure other means of transportation, may leave them isolated. We can only suggest, and not document, the local needs because of Allegheny's decision to discontinue the air service without first approaching the Commission. However, in any case, under the applicable Pennsylvania law, a presumption exists that certificated public utility service is needed and vital, until a public utility itself proves otherwise. Hostetter v. Pennsylvania Public Utility Comm., 160 Pa.Super. 94, 49 A.2d 862 (1946).

Secondly, Allegheny has presented no evidence which suggests that it would have been harmed had it had to resort to the state agency forum, or Commonwealth courts, before discontinuing the air service in question. It has approached the PUC for route changes many times, and it appears that all the airline's requests have been granted.[6] In any case, Allegheny may be able to raise its preemption arguments, should the PUC proceed to state court to enforce the order of June 23. *Cf.* Jones Motor Co. v. Pennsylvania Public Utility Comm., 188 Pa.Super. 449, 149 A.2d 491, reversed on other grounds, 361 U.S. 11, 80 S.Ct. 60, 4 L.Ed.2d 50 (1959).

Thirdly, if local communities have come to rely upon the services provided by Allegheny, such reliance would be reasonable in light of the affirmative action of the airline itself. Approximately thirty years ago, the airline sought and was granted, rights to transport property on intra-Pennsylvania routes; ap-

6. The stipulated statement of facts makes clear that Allegheny has worked within the framework of the PUC's regulations for many years. On many occasions when it wished to eliminate service to a Pennsylvania city, it has sought the PUC's prior approval. To cite but one example, on May 22, 1968, it petitioned the PUC to allow it to eliminate Hazleton as a point serviced by Allegheny airplanes. It also appears from the various changes in Allegheny's certificate of public convenience that it has approached the PUC when it wanted to add a stop flight between points which were being

serviced by non-stop direct service. Thus, for example, it requested, on Sepember 12, 1960, to service Reading as an intermediate point on its intrastate route No. 2 between Pittsburgh and Philadelphia. Finally, it also appears from the changes in Allegheny's certificate of public convenience that it has received PUC approval to eliminate non-stop air service between Pennsylvania cities. Thus, for example, in April of 1953, it sought approval to eliminate the flight between Johnstown and Dubois, which had been designated intrastate route No. 5.

proximately twenty years ago, it sought, and was granted the right by the PUC to transport persons as well as property between points in Pennsylvania. From that date, until the action delineated here, the airline has complied with the procedural requirements of Pennsylvania law. Thus, this case is significantly different—and poses a greater danger of exacerbating federal state relations—than the case of an airline which has never approached a state commission, and finds that a state commission is attempting to regulate it for the first time on the supposition that it is engaging in intrastate operations. See e. g., Public Util. Comm. v. United Air Lines, 346 U.S. 402, 74 S.Ct. 151, 98 L.Ed. 140 (1953).

Fourthly, the danger of creating federal-state friction is intensified because of the peculiar nature of the relief requested by the airline. At oral argument, the district court pointed out that Allegheny was seeking the best of all possible worlds. It wished to retain its state rights and, at the same time, to be relieved by federal injunction of its state duties.[7] This is precisely what the airline desires. It asks for a perpetual injunction which would enjoin the PUC from *"any action or proceeding* for any violation of the laws of the Commonwealth of Pennsylvania based upon action by Allegheny in changing its patterns of service." Yet, if this relief be granted, the PUC would be unable to terminate the airline's state certificates of public convenience. The airline, while not being subject to state regulation, would maintain whatever benefits accrue to holders of state public utility certificates. The case therefore is different from that of an interstate carrier whose routes contain several short intrastate segments, and who wishes to surrender its state certificate and remove itself totally from the state jurisdiction.

Finally, we do not believe that there are significant federal concerns which would override the other factors mentioned above. Even if it should be ultimately determined that the state does not have power to regulate the actions which precipitated this suit, a temporary co-existence of federal-state regulation will not frustrate any immediate goals or policies of the Federal Aviation Act. At least a residual power to regulate air transportation lies with the states. The scheme of federal control has not been hampered, even though some areas exist over which the states exercise sole or concurrent control.[8] *See, e. g.,* Colorado Anti-Discrimination Comm. v. Continental Air Lines, Inc., 372 U.S. 714, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1962); Public Util. Comm. v. United Air Lines, 346 U.S. 402, 74 S.Ct. 151, 98 L.Ed. 140 (1953); Loma Portal Civic Club v. American Airlines, Inc., 61 Cal.2d 582, 39 Cal.Rptr. 708, 394 P.2d 548 (1964); People v. Western Air Lines, 42 Cal.2d 621, 268 P.2d 723 (1954).

For the reasons outlined above, we conclude that the district court did not abuse its discretion in refusing to exercise its power to intervene.

The judgment will be affirmed.

---

7. The district court noted:
   . . . you [Allegheny] are at somewhat of a disadvantage in that you come before me, having sought and obtained certain local rights, having had those local authorities who granted you those rights determine that you are not complying, and in your having failed to either pay the fine or keep the rights because you are dissatisfied with the interpretation, and instead you are asking me to enjoin them from enforcing their interpretation of the rights they have granted you and *yet at the*

   *same time permit you to retain those rights.*
   (Emphasis supplied.)

8. All parties to this suit, including the amicus Civil Aeronautics Board, agree that under current CAB regulations, Allegheny may, or may not, at its option, connect Harrisburg and Williamsport by non-stop flights. Additionally, the CAB has declined to take a position with respect to the district court's jurisdiction or the appropriateness of its exercise.