613 F.Supp. 837 (1985)
The PILGRIM MEDICAL GROUP, a New Jersey Corporation, Plaintiff,
v.
NEW JERSEY STATE BOARD OF MEDICAL EXAMINERS and Irwin Kimmelman, Attorney General of the State of New Jersey, Defendants.
Civ. A. No. 84-5178.
United States District Court, D. New Jersey.
July 10, 1985.
*838 Horowitz, Bross, Sinins & Imperial by Keith Bonchi, Newark, N.J., for plaintiff.
Irwin I. Kimmelman, Atty. Gen. of N.J. by Joan D. Gelber, Deputy Atty. Gen., Newark, N.J., for defendants.

OPINION
SAROKIN, District Judge.

INTRODUCTION
At issue in this case is a state regulation which prohibits certain abortions in clinics when the same abortions are permitted in hospitals. While recognizing the need to regulate abortions in order to safeguard the health of the patient, the courts must be alert to prevent encroachments upon the constitutional rights of those seeking and entitled to abortions. Requiring that certain abortions be performed only in hospitals increases the costs of the procedure considerably and may thus dissuade or deprive some women otherwise entitled from obtaining such service. Therefore, only if the regulations and restrictions comport with accepted medical practice may they be sustained. While the safety and health of the patient are paramount, and the state has a legitimate interest in their protection, the conditions imposed must be such that they do not thwart the availability of low cost abortions unless mandated by accepted and recognized medical standards. Any distinction between abortions which may be performed in hospitals but not in non-hospital facilities must meet this test. To permit otherwise would result in a violation of the right to abortion now clearly guaranteed by decisions of the United States Supreme Court.
Whatever standards make it appropriate to perform abortions in a hospital *839 setting can be imposed in non-hospital facilities, provided such conditions are consistent with present medical knowledge and practice. No risk should be permitted below that standard, but no arbitrary impediment should be imposed above it. The constitutional right to an abortion and the need to perform such abortion pursuant to safe and accepted practices are goals which can be accomplished in harmony. The discord of the underlying issue regarding the right to abortion issue is not presented here and should not affect either the initiation of a regulation or its interpretation. For the following reasons, enforcement of the regulation here in issue is enjoined.
Plaintiff Pilgrim Medical Group, which operates an abortion clinic located in Montclair, New Jersey, brings this five-count, fifty-four paragraph Complaint challenging a New Jersey state regulation governing the performance of abortions in non-hospital settings. In particular, plaintiff contends that such regulation violates state and federal law by not allowing such abortions at eighteen weeks gestation, or twenty weeks from a patient's last menstrual period ("LMP"). It seeks injunctive relief against the enforcement of such regulation, and against a pattern of harassment allegedly perpetrated against it by defendant. Before the court is plaintiff's application for a preliminary injunction, as well as defendant's motion to dismiss the complaint on abstention grounds.

REGULATORY BACKGROUND
The historical background of the regulation here at issue is presented in defendant's brief and the appendix thereto and is not disputed by plaintiff. After notice and public comment, on June 23, 1978, the defendant New Jersey State Board of Medical Examiners adopted N.J.A.C. 13:35-7.2, later denominated N.J.A.C. 13:35-4.2. This regulation provided that dilatation and evacuation ("D & E"), abortions could be performed in either hospitals or other licensed health care facilities within sixteen weeks LMP, or fourteen weeks gestation.[1] Beyond these time periods, or utilizing other procedures, abortions were required to be done only in licensed hospitals. This regulation was upheld as against constitutional challenge in the state courts. See Livingston v. New Jersey State Board of Medical Examiners, 168 N.J.Super. 259, 402 A.2d 967 (App.Div.), certif. den., 81 N.J. 406, 408 A.2d 800 (1979). However, by notice published April 4, 1983, defendant proposed repeal of N.J.A.C. 13:35-4.2; a new regulation was proposed, and ultimately adopted re-wording the old regulation and eliminating the requirement that abortion procedures be performed on an in-patient basis. See 15 N.J.R. 1255 (8/1/83) (Defendant's Exh. E.).
On June 15, 1983, the Supreme Court of the United States announced its decisions in City of Akron, v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); Planned Parenthood Association of Kansas City, Missouri, Inc. v. Ashcroft, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733; and Simopoulos v. Virginia, 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983). In part pertinent to this case, these decisions stand for the proposition that a state may not unreasonably burden a women's right to seek a second trimester abortion by requiring all such abortions to be performed in a hospital setting, when to do so is not mandated by acceptable medical practice. Akron, 462 U.S. at 433-34, 103 S.Ct. at 2494-95. Hence, the Court invalidated an Akron ordinance and a Missouri statute requiring that all second trimester abortions be performed in a hospital. Akron, 462 U.S. at 434-39, 103 S.Ct. at 2494-97; Ashcroft, 462 U.S. 481-82, 103 S.Ct. 2520-21. It concluded "that `present medical knowledge,' Roe [v. Wade, 410 U.S. 113, 163, 93 S.Ct. 705, 731, 35 L.Ed.2d 147 (1983)], convincingly undercuts [the] justification for requiring that all second-trimester abortions be performed in a hospital." *840 Akron, 462 U.S. at 437, 103 S.Ct. at 2496 (emphasis in original) (footnote omitted). The Court implied that it would be unreasonable, and therefore unconstitutional, to require that second-trimester abortions prior to eighteen weeks of pregnancy be performed in a hospital. Id. at 437, 103 S.Ct. at 2496, citing American College of Obstetricians and Gynecologists, Standards for Obstetric-Gynecological Services 54 (5th ed. 1982).[2]
In the wake of these rulings, the Medical Director of Metropolitan Medical Associates requested the State Board of Medical Examiners to re-examine its rule. A formal petition to that effect was filed on December 5, 1983; citing four studies, it argued that a D & E abortion ought to be allowed to be performed in a non-hospital setting up to at least eighteen weeks LMP. Indeed, it apparently suggested that such abortions could take place up to twenty-three weeks LMP. On December 14, 1983, a committee was appointed to study the matter. Defendants Exh. F. Notice of the proposed modification of the rule was published in the New Jersey Register on February 6, 1984. 16 N.J.R. 262. In the meantime, by memorandum dated January 24, 1984, the Committee appointed by the Board concluded that N.J.A.C. 13:35-4.2 ought to be changed. It wrote:
It is the opinion of the Committee that the New Jersey rule concerning termination of pregnancy should be modified. The modification should bring the rule into agreement with the standards used in the manual from the American College of Obstetrics and Gynecology. That manual states "In a hospital based or in a free standing surgical facility or in an outpatient clinic meeting the criteria for a free standing surgical facility, abortions should be limited generally to 18 weeks from the last menstrual period."
Defendant's Exh. G. However, the committee rejected the suggestion that D & E abortions be allowed outside of hospitals beyond eighteen weeks LMP; it thus concluded that the rule ought not allow abortion clinics to perform abortions at eighteen weeks gestation. The defendant Board approved this rule and, on August 6, 1984, published the proposed rule in the New Jersey Register, inviting "in writing data, views or arguments relevant to the" rule to be submitted before September 5, 1984. 16 N.J.R. 2064 (Aug. 6, 1984). According to defendant, the proposed rule,
... was also circulated to three major newspapers, the two State Medical Societies, University of Medicine and Dentistry of New Jersey, the State Department of Health, the New Jersey Hospital Association, the petitioners, and other individuals who had notified the Board of their interests. Considerable public comment was received, but no comment at all was received from plaintiff.
Defendant's Brief at 7. In particular, the Board received thirty-two comments on the rule, twenty-six opposed and six in favor. "Those opposed, including the New Jersey Catholic Conference, another Catholic organization, and private individuals, referred uniformly to their sincerely held convictions that terminations of pregnancy are wrong per se, and objected to any measures which would lessen the burden on persons elected [sic] to terminate pregnancies. No reasons of a medical nature affecting the safety of the patient were advanced to support that opposition." 16 N.J.R. 2823 (Oct. 15, 1984). Two clinics, Planned Parenthood of America and of New Jersey, the Medical Society of New Jersey and the State Department of Health supported the rule. Ibid. See also Defendant's Exh. H.
The rule amendment was adopted at the September 12, 1984 Board meeting, id., and filed September 29, 1984. It became effective October 15, 1984. 16 N.J.R. 2823. As adopted, the rule reads:
13:35-4.2 Termination of Pregnancy

*841 (a) The termination of pregnancy is a procedure which may be performed only by a physician licensed to practice medicine and surgery in the State of New Jersey.
(b) Beyond the first trimester and within a period of gestation not exceeding 18 weeks from the first day of the last menstrual period or 16 weeks' gestational size as determined by a physician, termination of pregnancy using the dilatation and evacuation procedure shall be performed either in a licensed hospital or a licensed health care facility, and if any other procedure is used the termination of pregnancy shall be performed in a licensed hospital.
(c) Any licensed health care facility performing procedures for termination of pregnancy after the 14th week from the first day of the last menstrual period or 12 weeks' gestational size must have a Medical Director and a Credentials Committee. Said Committee shall grant to operating physicians practice privileges relating to complexity of the procedure and commensurate with an assessment of the training, experience and skills of each physician for the health, safety and welfare of the public. A list of the privileges of each physician shall contain the effective date of each privilege conferred, shall be reviewed at least biennially, and shall be preserved in the files of the facility.
(d) Termination of pregnancy by any procedure on patients with a gestation exceeding 18 weeks from the first day of the last menstrual period or 16 weeks' gestational size as determined by a physician, shall be performed only in a licensed hospital.
(e) These rules are intended to regulate the quality of medical care offered by licensed physicians for the protection of the public, and are not intended to affect rules of the Department of Health establishing institutional requirements.
Plaintiff here challenges N.J.A.C. 13:35-4.-2(b) and (d), arguing that, in the words of renowned abortion expert Dr. David A. Grimes, "... it is within accepted medical practice for a qualified medical doctor to perform an abortion up to 18 weeks gestation in an outpatient abortion clinic." Aff. of David A. Grimes, M.D. (12/12/84) ¶ 3. Doctor Sidney A. Wilchins, who is affiliated with plaintiff, agrees, Aff. of Sidney A. Wilchins, M.D., (12/11/84) ¶¶ 8, 19, and states that he and another doctor practicing at plaintiff's clinic are qualified to perform abortions at eighteen weeks gestational size, at such clinic. Hence, plaintiff seeks to extend the period in which such nonhospital abortions are performed by two weeks. Defendant disagrees. Its expert states that, while "sympathetic with the concept of extending the duration of abortion that might be performed in a patient facility," Aff. of Michael S. Burnhill, M.D. (1/10/85) at 3, he believes that D & E procedures ought not be done "on a routine basis past the 18th week LMP in a non-hospital clinic...." Id. at 2. Dr. Burnhill states that whether or not they should be performed in such setting depends upon the doctor's skill, as well as the facilities available at the particular clinic involved. Id. at 2-3. He concludes
With the exception of the petitioner Pilgrim Medical Group and possibly one other freestanding facility in the State of New Jersey, I know of no other group that is ready, willing or able to perform advanced terminations on a clinic outpatient setting in the State of New Jersey. I am willing to see a situation in which one or two petitioners acting under appropriate guidelines would be given the authority within the licensing act to perform advanced procedures possibly subject to review at the end of the year to determine whether or not they are sufficiently safe to protect the interests of the population of New Jersey.
Id. at 3. Defendant also argues that plaintiff ought not be permitted to appear in this court without at least attempting to invoke the comprehensive administrative procedures available to it in the state system. It is to that issue which the court now turns.

*842 AVAILABLE ADMINISTRATIVE PROCEDURES
It appears that there are, essentially, two sets of administrative procedures which plaintiff might now invoke, or before have invoked, in order to seek a change in N.J. A.C. 13:35-4.2. The first is the administrative rulemaking which has resulted in the current rule. Such rulemaking is authorized by New Jersey Statute Annotated 52:14B-4(f), which states
An interested person may petition an agency to promulgate, amend or repeal any rule. Each agency shall prescribe the form for the petition and the procedure for the submission, consideration and disposition of the petition. The petition shall state clearly and concisely:
(1) The substance or nature of the rulemaking which is requested;
(2) The reasons for the request and the petitioner's interest in the request;
(3) References to the authority of the agency to take the requested action. Within 30 days following receipt of any such petition, the agency shall either deny the petition, giving a written statement of its reasons, or shall proceed to act on the petition, which action may include the initiation of a formal rulemaking proceeding. Upon the receipt of the petition, the agency shall file a notice stating the name of the petitioner and the nature of the request with the Office of Administrative Law for publication in the New Jersey Register. Notice of formal agency action on such petition shall also be filed with the division for publication in the Register.
See also N.J.A.C. 1:30-3.6. This is the procedure which took place based upon the Metropolitan Medical Associates' petition and which resulted in the amendment of N.J.A.C. 13:35-4.2 to allow D & E abortions in non-hospital settings up to eighteen weeks LMP, rather than within the sixteen week limitation of the prior regulation. It is a procedure which plaintiff, having earlier foregone participation in the rulemaking process, could invoke now, though it argues that to do so would be futile, since the defendant Board has already considered the arguments which plaintiff would make and has rejected them. Plaintiff's Reply Brief at 16-17. See Defendant's Exh. H at 2 (rejecting effort to extend "outer permissible limit" to twenty weeks LMP).
Though not explicitly argued by defendant, a second type of administrative procedure available to plaintiff is suggested by Dr. Burnhill. Admitting that two clinics, including plaintiff, have the facilities to perform D & E abortions after eighteen weeks LMP, Dr. Burnhill states his willingness "to see a situation" in which such clinics are allowed to do such abortions on a trial basis, and seems to imply that the New Jersey state licensing act would accordingly allow exceptions to N.J.A.C. 13:35-4.2 to be made. The court has not, however, been made aware of any provision of law which would create such exception. Indeed, N.J.A.C. 13:35-4.2(e), makes clear that, although N.J.A.C. 13:35-4.2(c) requires a Credentials Committee to grant physicians the privilege to perform abortions beyond fourteen weeks LMP, such Committee has no right to act in contravention of the institutional requirements set forth by the Department of Health. See Defendant's Exh. H; 16 N.J.R. 2823. The court is not persuaded, nor does defendant argue, that N.J.A.C. 13:35-4.2(e) will allow the Department of Health, or any other licensing authority, to license a physician to perform abortions beyond eighteen weeks LMP in a clinic. The regulation would not permit it to do so and, although exceptions to such rule could easily have been incorporated in the rule, none were.
Finally, lurking in the background of this action is an entirely different problem, implicating distinct administrative remedies. In particular, it appears that an investigation of plaintiff by defendant, revealed that they perform second trimester abortions through twenty-three weeks LMP. See Letter from Charles A. Janousek to Sheldon Bross (1/18/84), App. to Complaint. See also Defendant's Exh. A. Also discussed in the investigative file of plaintiff are allegations of the failure to make required *843 reports and otherwise to follow state rules; uncleanliness; an unregistered physician doing abortions; failure properly to screen or control personnel; etc. Defendant's Exh. L. Such violations have not, as of yet, given rise to formal administrative enforcement proceedings pursuant to New Jersey Statute Annotated 45:1-14 et seq. and N.J.A.C. 13:44A-1.1 et seq. Such proceedings are also included within the administrative procedures contemplated by the parties in this case.

DISCUSSION

A. Abstention
Defendant first argues that the court should abstain from exercising its undisputed jurisdiction over this matter, in light of the comprehensive administrative apparatus available to challenge N.J.A.C. 13:35-4.2(a), as well as plaintiff's failure previously to avail itself of that apparatus. In so arguing, defendant invokes that aspect of abstention doctrine known as Burford abstention, based upon Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). There, the Supreme Court held that the interests of "furthering the harmonious relation between state and federal authority" required abstention where
"[t]he State provides a unified method for the formation of policy and determination of cases by the [administrative agency] and by the state courts. The judicial review of the [agency's] decision in state courts is expeditious and adequate. Conflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts. On the other hand, if the state procedure is followed from the agency to the State Supreme Court, ultimate review of the federal question is fully preserved here. Cf. Matthews v. Rodgers, 284 U.S. 521 [52 S.Ct. 217, 76 L.Ed. 447 (1932)]. Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand."
319 U.S. at 332-34, 63 S.Ct. at 1107. Hence, Burford abstention is appropriate where "the exercise of federal court jurisdiction would interfere with a state regulatory scheme dealing with matters of significant importance to the state," Harris v. Pernsley, 755 F.2d 338, 344 (3d Cir.1985), at least where there is "adequate state court review of an administrative order based upon predominantly local factors...." Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 349, 71 S.Ct. 762, 768, 95 L.Ed. 1002 (1951). See generally Heritage Farms, Inc. v. Solebury Township, 671 F.2d 743, 746 (3d Cir.), cert. denied, 456 U.S. 990, 102 S.Ct. 2270, 73 L.Ed.2d 1285 (1982); Baltimore Bank for Cooperatives v. Farmers Cheese Cooperative, 583 F.2d 104, 108-09 (3d Cir.1978); Allegheny Airlines, Inc. v. Pennsylvania Public Utilities Commission, 465 F.2d 237, 241-44 (3d Cir.1972) (citing cases), cert. denied, 410 U.S. 943, 93 S.Ct. 1367, 35 L.Ed.2d 609 (1973). On the other hand, the court is reminded that Burford abstention, like other abstention doctrines, is meant to be a narrowly construed exception to the general rule that federal courts have "virtually the unflagging obligation" to exercise the jurisdiction granted them by Congress. Baltimore Bank For Cooperatives, supra, 583 F.2d at 111, quoting Colorado River Water Conservation District v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1975). See also Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984); Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 14-15, 103 S.Ct. 927, 936-937, 74 L.Ed.2d 765 (1983).
Here, defendant contends that Burford abstention is appropriate because
The New Jersey Medical Board has full authority to deal with plaintiff's concerns and the final actions of New Jersey administrative agencies are immediately appealable as of right to the Appellate Division of Superior Court. See New Jersey Rules of Court 2:2-3a. To best accomodate the State interests involved in this case, without impairing the interest of *844 plaintiff in an expeditious review of its claim, this Court should dismiss the pending action in order to provide the New Jersey Board of Medical Examiners the opportunity to accept a petition from plaintiff and to consider the medical evidence it may submit with regard to possible amendment of the Medical Board rule on termination of pregnancy. Since plaintiff's demands in this complaint are so open-ended and unfocused, and appear to demand total abandonment of Board regulation of what surgical procedures may be performed on patients outside of hospitals, the court's abstention from exercising jurisdiction in this case and permitting the matter to be considered by the professional agency charged with that responsibility would be especially appropriate.
Defendant's Brief at 11-12. Defendant also notes the strong state interest in protecting the public health, by licensing, rulemaking and other means. Id. at 10.
The court finds these contentions not to justify abstention in the instant case. It is true, as defendant argues, that the State has a strong interest in its regulation of public health. Standing alone, however, such interest does not require abstention. See Zablocki v. Redhail, 434 U.S. 374, 380 n. 5, 98 S.Ct. 673, 677 n. 5, 54 L.Ed.2d 618 (1978) ("... there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy."); Ada-Cascade Watch Co., Inc. v. Cascade Resource Recovery, Inc., 720 F.2d 897, 903 (6th Cir.1983); Evans v. City of Chicago, 689 F.2d 1286, 1295 (7th Cir.1982). And, while the issue in question is one requiring an assessment of "present medical knowledge," as to which the defendant Board has special competence, the Supreme Court has announced time and again that such issue is not beyond the competence of federal courts. See, e.g., Akron, 462 U.S. at 434-39, 103 S.Ct. at 2495-97. Nor, as in Burford and its progeny, are particularly difficult issues of state law presented. See, e.g., Zablocki, supra, 434 U.S. at 380 n. 5, 98 S.Ct. at 677 n. 5 (no abstention, where "[u]nlike Burford, this case does not involve complex issues of state law ..."); Heritage Farms, supra, 671 F.2d at 746 (same). Most important, however, the court's decision in this matter will not disrupt state efforts to establish a coherent policy with respect to the issues presented. Ibid. See also Silverman v. Barry, 727 F.2d 1121, 1124 n. 4 (D.C.Cir.1984); Southern Railway v. State Board of Equalization, 715 F.2d 522, 527 (11th Cir.1983), cert. denied, ___ U.S. ___, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); Ada-Cascade, supra, 720 F.2d at 903; Evans v. City of Chicago, supra, 689 F.2d at 1295. Rather, the issue presented is one upon which the defendant Board has already had an opportunity to rule, and, having examined essentially the same medical and legal authorities as plaintiff presents here, and confronted the same arguments, promulgated the current rule. Thus, this is not a case in which "an early entry of a federal court into the area might promote needless friction between state and federal jurisdiction." Allegheny Airlines, supra, 465 F.2d at 242-43 (citing cases).
Rather, this is a case in which the court confronts what is essentially a question of federal civil rights. See Harris v. Pernsley, supra, 755 F.2d at 344. See generally C-Y Development Co. v. City of Redlands, 703 F.2d 375, 381 (9th Cir.1983); Manney v. Cabell, 654 F.2d 1280, 1284 (9th Cir.1980) ("... federal courts are particularly hesitant to abstain in section 1983 cases"), cert. denied, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982); Canton v. Spokane School District # 81, 498 F.2d 840, 846 (9th Cir.1974), citing Wright v. McMann, 387 F.2d 519, 525 (2d Cir.1967); Devlin v. Sosbe, 465 F.2d 169, 172 (7th Cir.1972) (citing cases); Jones v. Metzger, 456 F.2d 854, 856 (6th Cir.1972), cited in J-R Distributors, Inc. v. Eikenberry, 725 F.2d 482, 488 (9th Cir.) prob. jurisdiction noted, ___ U.S. ___, 105 S.Ct. 76, 83 L.Ed.2d 25 (1984). Furthermore, it does so not in the context of an ongoing state administrative proceeding of the adjudicative type, such as existed in, for example, *845 Burford or Southern Railway. See also Allegheny Airlines, supra. Instead, defendant seeks to justify abstention by the court in favor of a rulemaking proceeding, reviewable by the Appellate Division of Superior Court. Such proceeding, which will be duplicative of those which have already taken place and may well delay this matter further, will not apply state law to the circumstances of plaintiff's case but rather, will result in yet another rule which may be attacked, as this one has been, on its face. Where the current rule is being challenged on facial constitutional grounds rather than being interpreted, where such challenge has once before failed in the state administrative mechanism in favor of which the court is asked to abstain, and where the result is likely to yield continued litigation, later in time and after some delay, the court, in the exercise of its equitable discretion ought not abstain. See generally Burford, supra, 319 U.S. at 332-33, 63 S.Ct. at 1106-07; Emrick v. Bethlehem Steel Corp., 624 F.2d 450, 453-54 (3d Cir. 1980) (dismissal on abstention grounds "is an exercise of the district court's sound equitable discretion"). Defendant's motion to dismiss is therefore denied.[3]

B. Preliminary Injunction
In considering plaintiff's application for relief, the court is to be guided by four factors:
(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of such relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest.
Si Handling Systems, Inc. v. Heisley, 753 F.2d 1244, 1254 (3d Cir.1985), citing Klitzman, Klitzman and Gallagher v. Krut, 744 F.2d 955, 958-59 (3d Cir.1984); Continental Group v. Amoco Chemicals Corp., 614 F.2d 351, 356-57 (3d Cir.1980). Upon such consideration, the court here finds that certain of the equitable relief sought by plaintiff is warranted.

1. Likelihood of success on the merits
The court finds that plaintiff is likely to succeed in showing that N.J.A.C. 13:35-4.2 is unconstitutional based upon the standards set forth in Akron, Ashcroft, and Simopoulos. Those cases make clear that a regulation inhibiting the right to a second trimester abortion is to be upheld only upon a showing of a reasonable relationship to maternal health, and that such showing is made only where the regulation comports with "accepted medical practice." Akron, Ashcroft, and Simopoulos. Akron, 462 U.S. at 433-34, 103 S.Ct. at 2494-95. As in the Akron, case, defendant does not here argue that the regulation "imposes only an insignificant burden on women's access to abortion, but rather defends it as a reasonable health regulation." 462 U.S. at 435, 103 S.Ct. at 2495. In particular, as in Akron, the difference in cost between hospital-based abortions and non-hospital abortions is, apparently, enormous. According to plaintiff's Complaint, "While the average cost of an abortion in a hospital is in excess of $1,000, Pilgrim offers a medically safe abortion at a cost of approximately *846 $215." Verified Complaint ¶ 10. At eighteen weeks gestation, plaintiff offers abortions at a cost of approximately $495, as opposed to the $1,500 it would cost in a hospital. Wilchins Aff., ¶ 20. These cost differentials are even greater than those found compelling in Akron. 462 U.S. at 434-35, 103 S.Ct. at 2495 and n. 20.[4] Hence, there is no question, and defendant appears to concede, that N.J.A.C. 13:35-4.2 inhibits the fundamental right to an abortion enunciated by the Supreme Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and consistently applied ever since. See Akron, 462 U.S. at 420 n. 1, 103 S.Ct. at 2487 n. 1, citing Connecticut v. Menillo, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975); Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); Bellotti v. Baird, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); Beal v. Doe, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977); Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); Colautti v. Franklin, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979); Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); H.L. v. Matheson, 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981).
Of course, as the Court has also made clear time after time, such right is not absolute, and must yield to the State interest in protecting the potentiality of human life at the point of viability, on the one hand, and in safeguarding maternal health, on the other. Roe v. Wade, 410 U.S. at 154, 93 S.Ct. at 727. See generally Akron, 462 U.S. at 428-29, 103 S.Ct. at 2491-92. The latter interest, however, has been held not to be compelling until the end of the first trimester. Akron, 462 U.S. at 423-30, 103 S.Ct. at 2489-92, quoting Roe, 410 U.S. at 163, 93 S.Ct. at 731.
This does not mean that a State never may enact a regulation touching on the woman's abortion right during the first weeks of pregnancy. Certain regulations that have no significant impact on the woman's exercise of her right may be permissible where justified by important state health objectives. In Danforth, supra we unanimously upheld two Missouri statutory provisions, applicable to the first trimester; requiring the woman to provide her informed written consent to the abortion and the physician to keep certain records, even though comparable requirements were not imposed on most other medical procedures. See 428 U.S. at 65-67, 79-81 [96 S.Ct. at 2839-2840, 2845-2846]. The decisive factor was that the State met its burden of demonstrating that these regulations furthered important health-related state concerns. But even these minor regulations on the abortion procedure during the first trimester may not interfere with physician-patient consultation or with the women's choice between abortion and childbirth. See id., at 81 [96 S.Ct. at 2846].
From approximately the end of the first trimester of pregnancy, the State "may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health." Roe, 410 U.S. at 163 [93 S.Ct. at 732]. The State's discretion to regulate on this basis does not, however, permit it to adopt abortion regulations that depart from accepted medical practice. We have rejected a State's attempt to ban a particular second-trimester abortion procedure, where the ban would have increased the costs and limited the availability of abortions without promoting important health benefits. See Danforth, 428 U.S. at 77-78 [96 S.Ct. at 2844-2845]. If a State requires licensing or undertakes to regulate the performance of abortions during this period, the health standards adopted must be "legitimately related to the objective the State seeks to accomplish." Doe [v. Bolton, *847 410 U.S. 179, 195, 93 S.Ct. 739, 749, 35 L.Ed.2d 201 (1973)].
Akron, 462 U.S. at 430-31, 103 S.Ct. at 2492-93 (footnotes omitted).
The court finds that they are not so related here. In so finding, the court does not seek to ascertain the point in time at which second trimester abortions can no longer safely be performed in clinics. The evidence of record reveals that D & E abortions are most safely performed prior to sixteen weeks gestation, and that certain complications and dangers follow thereupon. Defendant's Exh. J; Wilchins Aff., Exhs. C-D. However, the sources cited by the parties make clear that the success or failure of late second trimester abortions in non-hospital settings depend upon a number of factors, particularly the skill of the physician. See Defendant's Exh. J., at 264 ("Some skilled physicians perform D & E abortions safely up to 24 weeks."); Wilchins Aff., Exh. C. at 406-07 (listing "prudent approaches for those non-hospital facilities wishing to perform outpatient abortions beyond 12 weeks' gestation"); Id., Exh. D at 562-63. Most importantly, defendant's own expert states that, while D & E abortions cannot be done "on a routine basis past the 18th week LMP in a non-hospital clinic," that under certain circumstances, particular clinics could do advance second trimester non-hospital abortions. Burnhill Aff. at 2-3. He states:
It is indeed true that the most important safeguard with respect to these procedures is dependent on the experience of the physician performing the cases. However, beyond that skill there are a number of additional factors which are necessary. These include:
1. The use of ultrasound to assure adequate evaluation of gestational length.
2. The use of laminaria insertions (either singly or serially) to provide for adequate cervical dilatation.
3. The presence of appropriate equipment to extract larger fetuses.
4. The presence of either an intravenous or heparin lock needle being in place on each case.
5. The rapid ability to transport a patient to the hospital in the event of a complication (with arrangements at the hospital to manage such complications). All of these items can, in fact, be spelled out within the framework of our medical licensing act ...
Ibid.
Thus, there is no question that some abortion clinics can perform late second trimester D & E abortions, although neither defendant's expert nor the court is assured that plaintiff has doctors sufficiently skilled to do so. By broadly prohibiting all non-hospital D & E abortions past eighteen weeks LMP, N.J.A.C. 13:35-4.2 sweeps too broadly, to the detriment of women's constitutional rights and contrary to accepted medical practiceindeed, medical practice that is accepted by defendant's expert himself. Defendant admits that exceptions to N.J.A.C. 13:35-4.2 could be carved out by the enactment of new licensing provisions. By nonetheless adhering to mere estimates of the proper time to prohibit second trimester abortions, the state hinders the right to abortion without bona fide medical reasons. The regulation, accordingly, appears unconstitutional, and the court finds that plaintiff is likely to succeed in proving that it is.
In so finding, the court carefully adheres to recent Supreme Court precedent. It is notable that the Court has endorsed state regulations which allow second trimester abortions in a licensed clinical setting based upon a complex of pertinent factors, Simopoulos, 462 U.S. at 515-16, 103 S.Ct. at 2538-39, while striking down those regulatory schemes which draw a bright line at a particular gestational point. Akron, Ashcroft. See also Birth Control Centers, Inc. v. Reizen, 743 F.2d 352, 366-67 (6th Cir.1984); American Colleges of Obstetricians and Gynecologists v. Thornburgh, 737 F.2d 283, 293 (3d Cir.1984); Margaret S. v. Treen, 597 F.Supp. 636, 657 (E.D.La. 1984). Clearly, an approach which maximizes *848 the opportunities for women to have non-hospital abortions, without medical danger, are preferred over those which create a highly administrable, though imperfect method of deciding when such abortions are and are not appropriate. The latter infringe the constitutional rights of women to choose or not to choose to terminate pregnancy without medical basis. Since N.J.A.C. 13:35-4.2 is this sort of regulation, it is likely to be held unconstitutional.

2. Irreparable harm and harm to third parties
Plaintiff, here asserts its own financial interests, as well as the constitutional rights of its patients. The former are certainly sufficient to satisfy the standing requirements of Article III of the Constitution, in that plaintiff can "show that [it] personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury `fairly can be traced to the challenged action' and `is likely to be redressed by a favorable decision.'" Valley Forge Christian College v. Americans United For Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976) (footnote omitted). See Singleton v. Wulff, 428 U.S. 106, 112-13, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976) (doctors have sufficient financial interest for standing to challenge abortion state); Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973) (doctors' interest in avoiding prosecution sufficient). Such financial interests probably do not, however, rise to the level of irreparable harm, see, e.g., Oburn v. Shapp, 521 F.2d 142, 151 (3d Cir.1975); nor has plaintiff made any showing that they do.
Plaintiff's assertion of its patients' constitutional rights, however, fully demonstrates the irreparable harm that will occur absent the intervention of the court. That these rights may be asserted by such patients' physicians is not, and cannot be, disputed. See Singleton, supra, 428 U.S. at 118, 96 S.Ct. at 2876. The fact that plaintiff herein is an abortion clinic, rather than an individual doctor, does not alter this conclusion. See, e.g., Birth Control Centers, Inc. v. Reizen, supra, 743 F.2d at 358; American College of Obstetricians, supra, 737 F.2d at 290 n. 6 (citing cases); Mahoning Women's Center v. Hunter, 610 F.2d 456, 458 n. 2 (6th Cir.1979). See also Akron, supra (allowing abortion clinic to bring suit, without comment).[5] More to the point, it cannot be denied that, given the price differential between second trimester abortions offered by plaintiff, and those performed in hospitals, many women, and particularly poor women, will forego such abortions, the exercise of their constitutional rights having been impermissibly chilled by the state regulation.[6] The resulting harm is as irreparable *849 as any that can be imagined: not only does it flow from the deprivation of constitutional rights, but it also creates a situation which is irreversible and not compensable. It renders preliminary injunctive relief appropriate and necessary.

3. Balancing of the equities
The court is aware of defendant's general interest in having a uniform regulatory scheme in the abortion context, to protect maternal health and insure high medical standards. It also recognizes defendant's hesitation in allowing late second trimester abortions to be performed by plaintiff in particular, given plaintiff's less than pristine record of rendering medical services. The court does not, however, find such considerations to outweigh the constitutional principles enunciated herein, or the irreparable harm discussed, supra. Therefore, the court must enjoin the enforcement of N.J.A.C. 13:35-4.2(b) and (d). On the other hand, the considerations of public safety here expressed mandate that the court stay such order for ninety days, in order to allow an appropriate regulation, specifying a procedure and criteria for licensing abortion clinics capable of performing advanced second trimester D & E abortions, to be promulgated.

CONCLUSION
There is probably no more volatile issue in this country today than the right to abortion. The Supreme Court having declared that right to be constitutional, encroachments upon it, both intended and unintended, must be stricken, unless they further and protect the health of the patient and accord with accepted, current medical standards and knowledge. Any regulation or law which has the effect of making abortions unavailable to those who cannot afford them, based upon criteria other than medical knowledge, diminishes the constitutional right to abortion granted to all women. This is such a regulation, and it requires the intervention and exercise of the injunctive powers of this court. An appropriate order will issue.
NOTES
[1] These figures are, on the average, equivalent, since gestation usually begins approximately two weeks after the last menstrual period.
[2] The Virginia statutory scheme at issue in Simopoulos was upheld as constitutional. It allowed second trimester abortions to be performed in clinics meeting certain criteria in the areas of organization, management, policies, procedures, staffing, facilities and services. 462 U.S. at 515-16, 103 S.Ct. at 2538-39.
[3] The State does not argue, nor does the court find, reason to abstain in order to await a state court determination that might moot or present in a different posture the federal constitutional question before the court, Midkiff, supra; Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), to avoid restraining a pending state court enforcement proceeding, Hoffman v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), or for reasons of wise judicial administration where state concurrent jurisdiction over a pending action exists. Moses H. Cone Memorial Hospital, supra. Similarly, neither the fact that a procedure might exist by which plaintiff, or certain of the physicians associated with plaintiff, could be licensed to perform abortions in a non-hospital setting after eighteen weeks LMP, see supra 460 U.S. at 10-11, 103 S.Ct. at 933-35, nor the fact that plaintiff might have the opportunity to assert its constitutional rights in an enforcement action not yet pending, see supra at 11-12, 103 S.Ct. at 934-35, justifies absention where, as here, the jurisdiction of this court has properly been invoked.
[4] It may also be the case that in New Jersey, as elsewhere, "few, if any, hospitals perform second-trimester abortions," Akron, 462 U.S. at 435 n. 21, 103 S.Ct. at 2495 n. 21, making the inability to obtain them in a clinic still more burdensome of women's constitutional rights.
[5] Even if plaintiff could not assert the rights of its patients, the court is required to consider such third party rights in determining whether to grant a preliminary injunction.
[6] The Court would, of course, prefer stronger evidence that such rights are in fact chilled than Dr. Wilchins' statement that "Most of my patients at Pilgrim would be unable to afford an abortion in a hospital ... The patients would either have to deliver the child or seek some type of illegal or unsafe abortion." Wilchins Aff. ¶ 20. However, the court follows the Supreme Court in finding such chilling an inevitable side effect of the price differentials here cited. Akron, 462 U.S. at 434-35 and n. 20, 103 S.Ct. at 2495 and n. 20. In any event, such price differentials make it highly likely that the irreparable harm alleged is in fact occurring. Prior to the entry of a permanent injunction in this matter, the court expects that plaintiff will introduce evidence that women's opportunities to obtain an abortion are, in fact, curtailed by N.J.A.C. 13:35-4.2. In the interim, the court finds the evidence submitted by defendant to the contrary to be too ambiguous to establish the contrary proposition, or to defeat the common sense conclusion that the regulation at issue chills women's constitutional rights. See Defendant's Exh. K (statement by defendant that late second trimester abortions "are done at United Hospitals of Newark").